**LOWER BRULE SIOUX TRIBE**

v.

**STATE OF SOUTH DAKOTA, Jack Merwin, Secretary, Division of Game, Fish and Parks for the State of South Dakota.**

No. CIV 80–3046.

United States District Court,
D. South Dakota.

April 30, 1982.

R. Dennis Ickes, Salt Lake City, Utah, Wm. J. Srstka, Jr., Pierre, S. D., for plaintiff.

Mark V. Meierhenry, Atty. Gen., Pierre, S. D., for defendants.

## MEMORANDUM OPINION

BOGUE, Chief Judge.

The Lower Brule Sioux Tribe brought this action against the State of South Dakota and Jack Merwin, Secretary of the State Department of Game, Fish, and Parks. In its complaint the Tribe seeks declaratory and injunctive relief concerning regulatory jurisdiction over hunting and fishing on the Lower Brule Reservation, 28 U.S.C. §§ 2201, 2202. This Court has jurisdiction over the controversy under 28 U.S.C. § 1362.[1]

---

1. In order to address potential defects in the Court's jurisdiction over this matter, the Court requested the parties to submit briefs on the issue whether the United States is a necessary

## BACKGROUND

The territory of the Sioux Nation was defined first by the Fort Laramie Treaty of 1851, 11 Stat. 749, and later, by the Second Fort Laramie Treaty of 1868, 15 Stat. 635. *See, United States v. Sioux Nation*, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). The Act of March 2, 1889, 25 Stat. 888, divided the Sioux Nation and described the boundaries of the Lower Brule Sioux Reservation. The reservation, generally, was situated in central South Dakota adjacent to and extending westward from the Missouri River. *See*, Plate 1. The eastern boundary of the reservation was established in "the center of the main channel of the Missouri River," from "Old Fort George," south to "Fort Lookout." The eastern boundary as of 1889 remained in the river even though the reservation was diminished along the western boundary in 1899, 30 Stat. 1362, and again in 1906, 34 Stat. 124. The General Allotment Act, 24 Stat. 388, authorized the issuance of fee patents to individual Indians covering land within the reservation. Title to some of these parcels eventually passed to non-Indians. Today the Tribe states that land ownership within the reservation is divided among the Tribe, individual allottees, the United States, and both Indian and non-Indian owners of fee land.

Under the 1944 Flood Control Act, P.L. 534–78, 58 Stat. 887, Congress authorized a comprehensive flood control plan which included the construction of several dams and reservoirs on the Missouri River. In order to construct the Big Bend and Fort Randall dam and reservoir projects, Congress authorized the acquisition of tribal and trust lands belonging to the Lower Brule Tribe, along the eastern boundary of the reservation. Tribal lands needed for the Fort Randall project were taken by the power of eminent domain. Congress enacted P.L. 85–923, 72 Stat. 1773, September 2, 1958, (hereinafter, "the Ft. Randall Taking Act"),

to provide compensation to the Tribe and its members for the land taken. On October 3, 1962, Congress enacted P.L. 87–734, 76 Stat. 698, to authorize the acquisition of and payment for tribal and trust lands needed for the Big Bend project. This case, in part, concerns the allocation of regulatory jurisdiction over hunting and fishing within these "taking areas."

The Tribe has adopted various hunting and fishing ordinances to improve management of wildlife resources on the reservation and within the taken areas. These ordinances were adopted pursuant to the tribal constitution. Some of the ordinances are inconsistent with state laws. For example, the Tribe does not prohibit the use of lead shot or other toxic shot shells by individuals hunting water fowl within the Reservation. The State prohibits the use of lead shot or other toxic shot in this area. In the past, the Tribe and the State have established different water fowl hunting season restrictions affecting the Missouri River and reservoir areas. The State established a Missouri River Refuge in portions of the River which include the Big Bend Reservoir and Lake Sharpe. Since the Tribe alleges that these areas are within Reservation boundaries, the Tribe established its own refuge in the same area and asserts the power to regulate hunting and fishing by all persons. The Tribe seeks to derive income through fees and licenses arising from its hunting and fishing regulation of the area.

Accordingly, the Tribe requests a declaration by this Court that the State lacks jurisdiction to regulate the hunting and fishing activities of any person within the exterior boundaries of the reservation. The Tribe also seeks to enjoin the State from applying and enforcing its hunting and fishing laws against both members and nonmembers of the Tribe. Conversely, the State contends that the Lower Brule Reservation was di-

---

or indispensable party to this action under Rule 19 of the Federal Rules of Civil Procedure. The Tribe and the State agreed that the United States was not an indispensable party whose absence would defeat the jurisdiction of this

Court. The United States was also invited to respond to the Rule 19 issue. The Government agreed it was not indispensable and declined to assert any of its interests in this controversy.

minished by the 1944 Flood Control Act and by the specific enactments which provided for the acquisition of tribal and trust lands needed for the Big Bend and Fort Randall dam and reservoir projects. The State further asserts that these acts abrogated the 1868 Treaty of Fort Laramie, to the extent that it reserved hunting and fishing rights of the Tribe within the taken area. Consequently, the State seeks a declaration by this Court that the State has exclusive jurisdiction to regulate hunting and fishing by all persons within the taken area.[2]

Having filed numerous depositions, exhibits and affidavits, both the Tribe and the State assert that there are no genuine issues as to any material fact. Thus, the merits of this case, as it applies to the "taking" areas, are before this Court on the parties' cross-motions for summary judgment. The pleadings initially state two issues:

(1) Did the acquisition of tribal and trust lands by the United States, pursuant to the 1944 Flood Control Act, diminish the Lower Brule Reservation and its boundaries to the extent of the taking?

(2) Did the acquisition of these lands abrogate the Lower Brule Sioux Tribe's treaty right to hunt and fish within the area acquired free of State regulation?

2. This Court is satisfied that the issue of hunting and fishing regulatory jurisdiction within the taking areas may be resolved by way of summary judgment. The Court is not certain that the same is true of jurisdiction outside the taking areas. Consequently, this Court has bifurcated its resolution of these issues. This Order and Memorandum Opinion will address only the respective powers of the Tribe and the State to regulate hunting and fishing by all persons within the areas taken from the Tribe for the Big Bend and Fort Randall Projects. This Court reserves its ruling on the remaining issues.

PLATE 2 LEGEND

Fort Randall Taking Area:
P.L. 85-923; P.L. 85-916

Big Bend Taking Area:
P.L. 87-734; P.L. 87-735

## RESERVATION DIMINISHMENT

■ It is well settled that congressional intent controls the determination whether the taking acts diminished the reservation boundaries. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 589, 97 S.Ct. 1361, 1364, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). The "fact of the Act," the "legislative history," and the "surrounding circumstances" must be examined in order to determine congressional intent. *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973). Doubtful expressions of congressional intent must be resolved in favor of the Indians and against finding reservation diminishment. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. at 586, 97 S.Ct. at 1362.

■ This is not the first time this Court has analyzed these taking acts in the context of a claim of reservation diminishment. In *United States v. Wounded Knee*, 596 F.2d 790 (8th Cir. 1979), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979), the Eighth Circuit Court of Appeals affirmed this Court's decision that the Act which took land of the Crow Creek Sioux Tribe for the Big Bend project did not diminish the Crow Creek reservation.[3] The decision in *Wounded Knee* governs this Court's present inquiry.

The Lower Brule and Crow Creek Tribes occupy reservations on opposite sides of the Missouri River. The tribes, therefore, simultaneously lost land under the taking acts for the Big Bend and Fort Randall

---

**3.** The *Wounded Knee* case involved a jurisdictional conflict over a rape offense which occurred on land taken from the Crow Creek Tribe for the Big Bend project. Since the reser-

vation was not diminished by the taking, the offense was committed in "Indian country." 18 U.S.C. § 1153. Thus, the United States had jurisdiction over the offense.

projects. On September 2, 1958, Congress enacted nearly identical acts providing for the settlement of all claims of the Crow Creek (P.L. 85–916, 72 Stat. 1766) and Lower Brule (P.L. 85–923) tribes for land taken for the Fort Randall project. Likewise, on October 3, 1962, Congress approved legislation which authorized the taking of both Lower Brule (P.L. 87–734) and Crow Creek (P.L. 87–735, 76 Stat. 704) lands needed for the Big Bend project. Again, the Big Bend Acts for Lower Brule and Crow Creek are nearly identical, as are the surrounding circumstances and legislative history.

The holding in *Wounded Knee* was that Congress did not intend the Big Bend Act, P.L. 87–735, to diminish the Crow Creek Reservation. 596 F.2d at 796. In order to determine congressional intent behind P.L. 87–735, however, this Court compared that Act to the Fort Randall Acts for both the Lower Brule and Crow Creek reservations. In its unpublished opinion, at page 5, this Court concluded that the Fort Randall Acts diminished the reservations from which the land was taken. On appeal, the Eighth Circuit agreed.[4] Neither the Tribe, nor the State succeeded in stating any argument which compels this Court to reach a different assessment of the taking acts in the present case.

The Fort Randall Acts both contain express language of diminishment. At section 6, both P.L. 85–923 (Lower Brule) and P.L. 85–916 (Crow Creek) provide: "The land selected by and purchased for individual Indians may be either inside or outside the boundaries of the reservation *as diminished*." [Emphasis supplied.] As part of the surrounding circumstances, the Eighth Circuit observed that Congress included similar language of diminishment in acts which took land for the Oahe Dam and Reservoir project from both the Cheyenne River and Standing Rock Reservations.[5] 596 F.2d at 792. In the corresponding section of the Big Bend Acts, however, Congress omitted the crucial phrase, "as diminished." *See*, P.L. 87–734 and P.L. 87–735 at section 11.[6] In holding that the Big Bend taking did not diminish the Crow Creek reservation the Eighth Circuit explained:

> Absent some strong indicia we must not assume that Congress carelessly or inadvertently omitted the critical words which it had included in similar previous acts with no intention or awareness that such an omission would result in any consequences. 596 F.2d at 794.

The same conclusion obviously must follow with respect to the Big Bend taking from the Lower Brule Reservation.

4. The Eighth Circuit stated, "this act [P.L. 85–916] did contain the phrase "as diminished" and did thereby diminish the Crow Creek Sioux Reservation." 596 F.2d at 795.

5. *See*, Act of September 3, 1954, P.L. 83–776, 68 Stat. 1191 (Cheyenne River) at section 11: "The lands so selected . . . may be . . . within the boundaries of the Cheyenne River Reservation *as diminished* by this agreement. . . ."; Act of September 2, 1958, P.L. 85–915, 72 Stat. 1762 (Standing Rock), which refers to selection of lands either inside or outside the boundaries of the reservation "as diminished."

The Tribe contends this Court should interpret the phrase "as diminished" in the Lower Brule/Fort Randall Act, P.L. 85–923, to refer to prior legislative diminishments of the reservation. The Tribe also states that the presence of the phrase "as diminished," by itself, cannot settle a question of reservation diminishment and cites *United States ex rel. Condon v. Erickson*, 478 F.2d 684, 687 (8th Cir. 1973). First, it is clear that the decision in *Wounded Knee* did

not rest solely upon the presence or absence of the phrase "as diminished" from any legislation. Second, it is apparent that both this Court and the Eighth Circuit previously interpreted the phrase "as diminished" to refer to the effect of the taking acts, not to prior diminishments in 1899 and 1906. Neither has the Tribe supplied any support for an alternative conclusion that the phrase refers to a loss of tribal lands *within* existing boundaries rather than to a geographic reduction of the reservation boundaries. *See, United States ex rel. Cook v. Parkinson*, 525 F.2d 120 (8th Cir. 1975), *cert. denied*, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

6. The Ninth Circuit recently emphasized the absence of any legislative reference to a "diminished reservation" when it held that allotment legislation did not diminish the Flathead Reservation. *Confederated Salish and Kootenai Tribes v. Namen*, 665 F.2d 951 (9th Cir. 1982).

Beyond the express language of diminishment, there are other statements on the face of the acts which persuade this Court that Congress intended to diminish the Lower Brule Reservation to the extent of the Fort Randall taking but not by the Big Bend taking. At section 1(a), both Big Bend Acts, P.L. 87–734 and P.L. 87–735 describe the interest taken as "any interest the Tribe or Indians may have within the bed of the Missouri River so far *as it is within* the boundaries of the reservation. . . ." [Emphasis supplied.] The Big Bend Act take-line lies well beyond the limits of the riverbed. *See*, Plate 2. Thus, language asserting the possible continued location of the riverbed *within* reservation boundaries would be inconsistent with congressional intent to diminish the reservation boundary to the full extent of the Big Bend taking.

Furthermore, the Big Bend Act contains a timber removal provision which authorizes the Indians to remove timber and improvements from the taken lands "on the reservation." P.L. 87–734, at section 9. The timber removal provision in the Fort Randall Act omits the phrase "on the reservation." P.L. 85–923, at section 4. Finally, the Big Bend Act, P.L. 87–734, section 12, provides for reimbursement of tribal expenses "incurred in connection with the taking of Indian lands *within the reservation* for the Big Bend project." [Emphasis supplied.] The reimbursement provision in the Fort Randall Act omits the phrase "within the reservation." P.L. 85–923, section 8.[7]

Although the legislative history of the acts provides little guidance concerning the diminishment issue, the Eighth Circuit summarized some of the surrounding circumstances which support the conclusion that Congress intended to diminish the Lower Brule Reservation by the Fort Randall taking but not by the Big Bend taking. 596

F.2d at 795. It is true that the Eighth Circuit's comments were directed solely to the Crow Creek Reservation. Nonetheless, the record in these cases shows that the circumstances surrounding the Big Bend taking from the Lower Brule and Crow Creek Tribes were nearly identical. The State, however, repeats an argument made by the defendants in *Wounded Knee*, based upon its view of the surrounding circumstances. The State contends that notwithstanding the absence of diminishment language from the Big Bend Act, Congress must have intended to diminish the reservation by the Big Bend taking. Throughout the history of takings pursuant to the 1944 Flood Control Act, the State claims that Congress showed its intent to treat equally all affected Indian tribes. The State concludes that there was no reason for Congress to treat the Lower Brule Tribe differently than it had treated other reservations in previous acts where Congress did explicitly diminish the reservations. This argument, deemed "ingenious" by the Eighth Circuit, was soundly rejected. 596 F.2d at 793. The surrounding circumstances supply plausible explanations for Congress' decision not to diminish the Lower Brule Reservation to the extent of the Big Bend taking.

Finally, this Court has considered the jurisdictional history of the taking areas. The State has traditionally claimed the exclusive power to regulate hunting and fishing by all persons in the taken areas. Accordingly, the record shows that the State has enforced its laws against both Indians and non-Indians. Although the current position of the Corps of Engineers is not a matter of record, in March, 1976, the Corps believed that the Tribe had no regulatory jurisdiction over hunting and fishing within the taking areas.[8] The Tribe has never abandoned its claim to regulatory jurisdiction.

---

**7.** This Court has also considered, and must reject the Tribe's argument that Congress indicated its intent not to diminish the reservation by the Fort Randall taking when it reserved to the Tribe a beneficial interest in the oil and gas within the taken areas. The fact that a beneficial interest is retained does not preclude a finding that the boundaries of the reservation

were diminished. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. at 601, n. 24, 97 S.Ct. at 1370, n. 24.

**8.** *See*, Letter from Russell A. Glenn, District Engineer, to Michael B. Jandreau, Tribal Chairman (March 9, 1976).

Due to the uncertainty in the law, however, the Tribe has acquiesced in the State's assertion of regulatory authority, both prior to and during the pendency of this action. The Tribe apparently is now willing to concede that the State has concurrent jurisdiction with the Tribe to regulate hunting and fishing, by all persons, within the taking areas.[9] Thus, the jurisdictional history of the area remains disputed. Unlike the record in *Wounded Knee*, however, the jurisdictional history in this case does not clearly "militate against a finding of diminishment." 596 F.2d at 795.

For the foregoing reasons, this Court concludes that Congress intended to and did diminish the Lower Brule Reservation to the extent of the taking for the Fort Randall Dam and Reservoir project. Congress, however, did not intend to diminish the Reservation to the extent of the Big Bend taking.

## ABROGATION OF TREATY RIGHTS

The State contends that even if the taking areas lay in whole or in part within the exterior boundaries of the Lower Brule Reservation, Congress abrogated or modified the hunting and fishing rights of the Tribe within the taken areas. By enacting the 1944 Flood Control Act, P.L. 85–923 and P.L. 87–734, the State further contends that Congress abrogated all regulatory jurisdiction of the Tribe within the taken areas. The State concludes that Congress conferred exclusive jurisdiction upon the State to regulate hunting and fishing by all persons within the taken areas. The Tribe disagrees.

The 1868 Treaty of Fort Laramie, at Article II, provides that the lands of the Lower Brule Reservation were "... set apart for the absolute and undisturbed use and occupation ..." of the Tribe. The Treaty thereby reserved to the Tribe exclusive and unrestricted hunting and fishing rights within the Reservation. These treaty rights ordinarily are implied from a res-

ervation of land for the exclusive use of a tribe. *See, Menominee Tribe v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *State v. Hero*, 282 N.W.2d 70 (S.D.1979); D. Getches, D. Rosenfelt, and C. Wilkinson, *Federal Indian Law: Cases and Materials*, at 618 (1979).

Nonetheless, Congress has the power unilaterally to abrogate treaty-reserved hunting and fishing rights. *United States v. White*, 508 F.2d 453, 456 (8th Cir. 1974). A treaty may be abrogated by a subsequent, superseding act of Congress. *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903); *Head Money Cases*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884). Rights secured by treaty, however, will not be deemed abrogated or modified absent a clear expression of congressional purpose. *United States v. Winnebago*, 542 F.2d 1002, 1005 (8th Cir. 1976). The intention to abrogate a treaty "is not to be lightly imputed to Congress." *Menominee Tribe v. United States*, 391 U.S. at 413, 88 S.Ct. at 1711. To support its claim that Congress intended to abrogate or modify the Tribe's treaty hunting and fishing rights within the taken areas, the State cites the language and legislature history of the 1944 Flood Control Act, P.L. 85–923 and P.L. 87–734.

### 1. THE 1944 FLOOD CONTROL ACT

The Flood Control Act was general legislation which authorized the construction of a series of dams and reservoirs on the Missouri River. 58 Stat. 887, December 22, 1944. The dams and reservoirs at Big Bend and Fort Randall were part of this comprehensive flood control plan for the Missouri River Basin. Section 4 of the Act is central to the State's claim of treaty abrogation. Section 4 provides, in pertinent part:

> The water areas of all such reservoirs shall be open to public use generally, without charge, for ... fishing and other

---

9. *See*, Tribe's Reply to Defendant's Amended Response to Plaintiff's Motion for Summary Judgment," at 7 and 18.

recreational purposes .... No use of any area to which this section applies shall be permitted which is inconsistent with the laws for the protection of fish and game of the State in which such area is situated.

This section is now codified at 16 U.S.C. § 460d. The State argues that the 1944 Act, § 4, is a general law, which by its terms renders all persons within the taken areas subject to state regulations for hunting and fishing. The Act, therefore, would abrogate the treaty rights of the Tribe to hunt and fish in the areas exclusively and free of state regulations.

When Congress opened to public use the dam and reservoir areas it clearly abrogated whatever remained of the Tribe's right to exclusive use and occupation of those portions of the taken land which remain within reservation boundaries. *See, Montana v. United States*, 450 U.S. 544, 558–561, 101 S.Ct. 1245, 1254–1256, 67 L.Ed.2d 493, 506–507 (1981). More important to this case, however, is the provision of section 4 which makes the use of the taken areas by all persons generally subject to state game and fish laws.

In a persuasive dissent in *United States v. White*, Judge Lay concluded that treaty-based hunting and fishing rights are Indian property rights which may be abrogated by a general law, which by its terms applies to all persons. *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). Thus, Judge Lay would have held that the treaty hunting rights of the Red Lake Band of Chippewa Indians were abrogated or modified by 16 U.S.C. § 668(a), which proscribes the unlawful taking of a bald eagle. He disagreed with the majority opinion in *White*, which held that the Eagle Protection Act could not abrogate treaty rights absent an express reference, in the Act or its legislative history, to modification of the treaty right to hunt eagles. 508 F.2d at 457–458.[10] The Ninth Circuit Court of Appeals recently addressed the same issue raised in *White*. The court disagreed with the *White* majority and followed Judge Lay's dissenting opinion concerning the effect of the Eagle Protection Act upon treaty hunting rights. *United States v. Fryberg*, 622 F.2d 1010 (9th Cir. 1980), *cert. denied*, 449 U.S. 1004, 101 S.Ct. 545, 66 L.Ed.2d 301 (1980).

The 1944 Flood Control Act, § 4, could also be found to have abrogated treaty hunting and fishing rights, if the *White* dissent and *Fryberg* stated the governing rule in this Circuit. They do not. Instead, the Eighth Circuit requires more specific reference to the Tribe and its treaty rights. Although the 1944 Flood Control Act, § 9(c), refers to irrigation of Indian trust or tribal lands, the Act does not refer to the Lower Brule Tribe, to its treaties, or to its hunting and fishing rights.[11] Thus, this Court must conclude that the 1944 Flood Control Act does not evince the clear intent of Congress to abrogate or modify the reserved treaty hunting and fishing rights of the Lower Brule Tribe. This Court reaches a different conclusion, however, with respect to the specific acts which authorized the taking of and settlement for tribal and trust lands of the Tribe.

---

**10.** The decision in *White* has been cited in support of a rule requiring express legislative action to abrogate Indian treaty rights. C. Wilkinson & J. Volkman, *Judicial Review of Indian Treaty Abrogation: "As Long As Water Flows, or Grass Grows Upon the Earth"—How Long A Time is That?* 63 Cal.L.Rev. 601 (1975).

**11.** To support its claim of abrogation, the State cites a portion of the legislative history of the 1944 Act. *H.Doc.* No. 475, 78th Cong. 2d sess., page 4, is a letter sent by the Chief of Engineers to the Chairman of the Committee on Flood Control of the House of Representatives. The letter acknowledges that the "proposed reservoirs will inundate Indian lands at several points." *Id.* The letter also states that approval of the plan for the improvement of the Missouri River includes the authority for the Indians to convey their property to the Government and to receive just compensation. This letter was considered by the Eighth Circuit in *United States v. Winnebago Tribe*, 542 F.2d at 1005–1006. The court concluded the letter failed to indicate the clear intent of Congress, under the 1944 Flood Control Act, to abrogate the Treaty of 1865, to permit the taking of Winnebago Indian tribal lands by eminent domain. *Accord, United States v. 2,005.32 Acres of Land*, 160 F.Supp. 193 (D.S.D.1958), *vacated as moot*, 259 F.2d 271 (8th Cir. 1958).

## 2. THE TAKING ACTS

■ By the Act of July 6, 1954, Congress authorized the negotiation and ratification of an agreement with the Lower Brule Tribe for the acquisition of land needed for the Fort Randall project. P.L. 478, 68 Stat. 452. Under the proposed agreement Congress sought to acquire "all tribal, allotted, assigned, or inherited lands or interests therein belonging to the Indians of the tribe . . . ." P.L. 478, § 2(a). Negotiations failed to supply an agreement with the Tribe. On January 21, 1955, therefore, a declaration of taking was filed in condemnation proceedings, which vested in the United States fee title to 7,997 acres, subject only to a reservation of the Indians' oil and gas rights. The Tribe received some compensation in these proceedings, and P.L. 85–923 later authorized additional compensation for tribal and trust lands thereby taken.

The State asserts that the language of both P.L. 85–923 (Fort Randall taking) and P.L. 87–734 (Big Bend taking) establish the clear intent of Congress to abrogate the Tribe's treaty hunting and fishing rights within the taken area. Specifically, P.L. 85–923, § 1, constituted the "settlement of all claims, rights, and demands of [the Lower Brule Tribe] and its members arising out of the construction of the Fort Randall . . . project." Likewise, by P.L. 87–734, § 1(a), Congress took "the entire interest, including gravel, but excluding the interest in oil, gas, and all other minerals . . . and any interest the tribe or Indians may have within the bed of the Missouri River . . . ." The legislative history for both taking acts repeats express statements of Congress' intent to take "the entire outstanding interest" of the Tribe and its members in the acquired land. See, e.g., H.Rep.No. 852, 87th Cong., 1st Sess., at 7.

It has been held that statutes which remove "all right, title and interest" of a tribe in certain land operate to extinguish treaty hunting and fishing rights in the land. See, Red Lake Bank of Chippewa Indians v. Minnesota, 614 F.2d 1161 (8th Cir. 1980), cert. denied, 449 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136 (1980); State v. Hero, supra. Thus, it may be that this language on the face of the acts constitutes sufficient indicia of congressional intent to extinguish treaty hunting and fishing rights of the Tribe within the taken area. There are, however, other statements in the acts and legislative history which satisfy even the strict treaty abrogation standard set out in United States v. White.

Congress understood and intended that by taking the Tribe's "entire interest" it was extinguishing interests and rights reserved by treaty. In H.Rep.No. 852, at 6, the purposes of P.L. 87–734 are identified: "The principal purposes . . . are to reimburse individual Indian[s] . . . and the . . . Tribe . . . for the trust lands acquired . . . [and] to compensate the tribe and its members for treaty and tribal damages . . . ." [Emphasis supplied]; see also, S.Rep.No. 1636, 87th Cong., 2d Sess., at page 5. Congress included within the scope of the taking under the acts "any interest the tribe or Indians may have within the bed of the Missouri River. . . ." Accompanying the bill which became P.L. 85–923 was the report of the Committee on Interior and Insular Affairs, which stated:

> The Lower Brule and Crow Creek Reservations include approximately 10,158 acres in the bed of the Missouri River . . . . The Committee deemed it in the overall interest that this acreage be removed from tribal ownership to prevent jurisdictional disputes and conflicts which would arise from exercise of treaty rights. H.Rep.No. 2054, 85th Cong., 2d Sess., at page 5.

The same committee later reported that acquisition of the entire interest of the Tribe in the riverbed was also intended "to insure complete control of the project." H.Rep.No. 852, supra, at page 9. Thus, the taking acts and the legislative history specifically refer to the abrogation of treaty rights within the taken areas. The acts also expressly refer to the hunting and fish-

ing rights of the Tribe and its members following the taking.

P.L. 85–923, § 5,[12] provides that the Tribe and its members "shall be *permitted* to have, without cost, access to the shoreline of the reservoir including *permission* to hunt and fish in and on the ... reservoir, *subject*, however, *to regulations* governing the corresponding use by other citizens of the United States." [Emphasis supplied.] P.L. 87–734, § 10, likewise provides that the "right" of tribal members to hunt and fish within the Big Bend taking area is "subject ... to regulations governing the corresponding use by other citizens of the United States." The legislative history clarifies Congress' intent behind this provision.

The report of the Committee on Interior and Insular Affairs noted that the original draft of H.R. 5144 (which became P.L. 87–734) would have conferred upon tribal members the right "to hunt and fish ... on the reservoir *without regard to State law*, but subject to regulations of the Secretary of the Interior regarding migratory waterfowl and to regulations of the Secretary of the Army regarding access." *H.Rep.No.* 852, *supra*, at pages 21, 26. [Emphasis supplied.] The Army Corps of Engineers opposed this provision because it permitted "uncontrolled hunting and fishing ... " by tribal members within the taken areas. *Id.* at page 17. The Secretary of the Army also objected to the provision because it excluded "the exercise of jurisdiction by the States of hunting and fishing within the reservoir areas." *Id.* at page 31. To remedy this defect, the Secretary proposed the amendment of H.R. 5144 to provide that hunting and fishing by members, within the taken areas would be "subject ... to regulations governing the corresponding use by

other citizens of the United States." *Id.* at page 33. Obviously, H.R. 5144 was so amended. Thus, Congress enacted P.L. 87–734, including the provision urged by the Secretary, and omitting the prior provision for member hunting and fishing "without regard to State law." The final content of P.L. 87–734, therefore, is consistent with the general provision of Congress concerning the operation of dams and reservoirs authorized by the 1944 Flood Control Act: "No use of any area to which this section applies shall be permitted which is inconsistent with the laws for the protection of fish and game of the State in which such area is located." 16 U.S.C. § 460d.

This Court concludes that the taking Acts meet the standard for treaty right abrogation recognized in *United States v. White.* Together, the acts and legislative history establish: (1) Congress knew and intended Lower Brule treaty rights would be abridged by the taking of tribal and trust lands. (2) P.L. 85–923 and P.L. 87–734 specifically refer to the hunting and fishing "rights" of the Tribe and its members within the taken areas. (3) The Acts expressly state that the hunting and fishing rights of the Tribe within the taken areas, rights once exclusive and unrestricted, are now subject to regulation, including applicable state law. Accordingly this Court holds that Congress intended to and did abrogate the treaty hunting and fishing rights of the Tribe within the taken areas. The present hunting and fishing "rights" or "privileges" of the Tribe within the taken areas are conferred by P.L. 85–923 and P.L. 87–734, and are subject to the limitations established therein, pursuant to the general plan authorized by the 1944 Flood Control Act.[13]

12. Obviously, if Congress did not intend to abrogate treaty hunting and fishing rights, it would have been unnecessary for Congress to grant its *permission* for such a use by the Tribe of the taken areas.

13. *H.Rep.No.* 852, *supra*, at page 8, states that the restricted right to hunt and fish within the taken area was among the "rights or privileges" conferred upon members *by the bill* which became P.L. 87–734. It would be meaningless

for Congress to confer restricted hunting and fishing rights upon members if Congress did not intend to abrogate the Tribe's treaty right to exclusive and unrestricted hunting and fishing within the taken areas. Thus, the present hunting and fishing rights of the Tribe *within the taken areas* no longer derive from the 1868 Treaty and are no longer superior to the rights of other United States citizens.

## REGULATORY JURISDICTION WITHIN THE TAKEN AREAS

From the foregoing, this Court must conclude that Congress conferred upon the State the exclusive power to regulate hunting and fishing by all persons within the taken areas. This conclusion is based primarily upon the express statements of congressional intent found in the acts and legislative history. The conclusion is also based upon the Court's analysis of applicable case law, set forth in the remainder of this opinion. Finally, this Court has considered, in the course of discovering congressional intent, the jurisdictional confusion and enforcement problems which would arise from alternative solutions to the regulatory jurisdiction issue.

For example, the location of a reservation boundary is one factor which affects the jurisdiction of a tribe and a state. Originally, the center of the old main channel of the Missouri River marked the eastern boundary of the Lower Brule Reservation. This single boundary line created sufficient jurisdictional confusion because the center of the main channel of the river is nearly impossible to identify or mark with precision. The confusion in this case was compounded by the two separate takings of tribal lands and by the decision compelled by *Wounded Knee* concerning the effect of those takings upon the Reservation boundaries.

Plate 2 shows the relationship between the land acquisitions from the Lower Brule and Crow Creek Reservations, north of the Big Bend Dam. The dark center strip represents the land taken from the Lower Brule and Crow Creek Tribes for the Fort Randall project. P.L. 85–923, P.L. 85–916. Lands taken south of the "East Limit" line are also included within the Fort Randall taking. The *Wounded Knee* decision compels the conclusion that the Fort Randall taking areas are no longer within reservation boundaries. 596 F.2d at 795. The lighter shaded area on Plate 2 represents the lands taken from the Lower Brule and Crow Creek Tribes for the Big Bend project. P.L. 87–734, P.L. 87–735. *Wounded Knee* compels the conclusion that these lands are still within the exterior reservation boundaries. 596 F.2d at 796. Thus, the eastern exterior boundary of the Lower Brule Reservation would be the line between the Big Bend and Fort Randall takings on the Lower Brule side of the river. In *Wounded Knee*, however, the Eighth Circuit correctly observed that the taking areas for the Fort Randall and Big Bend projects overlap. 596 F.2d at 795, n. 8. Thus, although no court should assume that Congress intended "to change [a] reservation to an area without defined boundaries . . .," *United States v. Long Elk*, 565 F.2d 1032, 1039 (8th Cir. 1977), the decision in *Wounded Knee* appears to recognize precisely that situation.

Accordingly, for jurisdictional purposes, there are several potential "zones" of jurisdiction within the taken areas. In some locations, moving from west to east across the taken areas, there may be at least four "zones": these are the Lower Brule/Big Bend taking, the Lower Brule/Fort Randall taking, the Crow Creek/Fort Randall taking, and the Crow Creek/Big Bend taking. Apart from the express language of the Acts, and under some interpretations of applicable law, non-Indians and Indians alike could be subject to differing regulations and authorities depending upon the "zone" in which they happened to be hunting or fishing. Since it is impossible to identify the boundaries of these zones, either on land or on the surface of the reservoirs, it is also impossible for either the Tribe or the State to enforce their hunting and fishing laws against violators. The situs of the violation could be an issue in nearly every enforcement attempt, and neither the Tribe nor the State would be assured that it could prove that the violation occurred within the geographic limits of their jurisdiction. The express language of the 1944 Flood Control Act, and the taking Acts, assures this Court that Congress did not intend such a jurisdictional nightmare when it took the entire interest of the Tribe in these lands and opened the reservoir areas to public use.

1.  REGULATION OF TRIBAL MEM-
    BER [14] HUNTING AND FISHING
    WITHIN THE TAKEN AREAS

The Tribe originally claimed exclusive jurisdiction to regulate hunting and fishing within the entire taken area west of the center of the main channel of the River. The Tribe's latest memorandum indicates, however, that it now concedes that the State should have concurrent jurisdiction with the Tribe to regulate hunting and fishing by all persons on the River. The State asserts exclusive jurisdiction over hunting and fishing within the area taken from the Tribe pursuant to the 1944 Flood Control Act.

■ The regulatory jurisdiction of the State over member hunting and fishing within the Fort Randall taking area must be exclusive. This taking area is outside the exterior boundaries of the Lower Brule Reservation. The Tribe does not claim off-reservation treaty hunting and fishing rights. No provision in the applicable treaties or statutes may be viewed to create such rights. *See, e.g., Puyallup Tribe v. Department of Game of State of Washington,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977); *Tulee v. Washington,* 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); *United States v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); *Kimball v. Callahan,* 493 F.2d 564 (9th Cir. 1974), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974). Having held that Congress abrogated the Tribe's treaty hunting and fishing rights within all of the taken areas, this Court must also conclude that the Tribe retains no special hunting and fishing rights upon land that is no longer reservation. *State v. Hero,* 282 N.W.2d 70 (S.D.1979). Thus, the applicable rule was stated in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–149, 93 S.Ct. 1267, 1270–1271, 36 L.Ed.2d 114 (1973): "[a]bsent express federal law to the con-

trary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State."

■ Whether the State may exclusively regulate member hunting and fishing within the Big Bend taking area is a more difficult question. This area is within the boundaries of the Lower Brule Reservation. Ordinarily, "[a] federal statute, treaty, or agreement setting aside a reservation for the use and occupation of a tribe is necessarily preemptive of state jurisdiction over Indian hunting and fishing activity on the reservation," Getches, et al., *Federal Indian Law: Cases and Materials, supra,* at 618; *State v. Clark,* 282 N.W.2d 902, 909 (Minn. 1979). So long as the relevant treaties or statutes do not extinguish aboriginal tribal hunting and fishing rights, the members' right to hunt or fish free of state regulation is viewed as an incident of reservation status. *White Earth Band of Chippewa Indians v. Alexander,* 518 F.Supp. 527, 534 (D.Minn.1981).

This Court has held, however, that Congress abrogated the provision of the 1868 Treaty which reserved the Big Bend taking area of the reservation for the Tribe's exclusive use and occupation. The Tribe cannot, therefore, rely upon this provision of the treaty (Article II) as a source of the members' right to hunt or fish in this area free of State regulations. This Court has also held that Congress abrogated the Tribe's treaty hunting and fishing rights within the Big Bend taking area. Thus, the Tribe cannot rely upon the reservation status of the area as a source of the members' right to hunt and fish free of State regulation.

■ It clearly is within the power of Congress to provide that the laws of a state shall apply to tribal Indians even with respect to conduct occurring on a reservation.

---

14. Most courts use the term "non-member" rather than "non-Indian." Indians who are not members of the Lower Brule Tribe stand on the same footing as non-Indians with regard to hunting and fishing on the Reservation. *See, Washington v. Confederated Tribes of Colville,*

447 U.S. 134, 160, 100 S.Ct. 2069, 2085, 65 L.Ed.2d 10 (1980); *White Earth Bank of Chippewa Indians v. Alexander,* 518 F.Supp. 527, 534, n. 3 (1981). The taking Acts in this case also refer to the rights or privileges of the Tribe and its members.

*Warren Trading Post v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *McClanahan v. State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Although a tribe's hunting and fishing rights are subject in the first instance only to federal regulation, Congress may further restrict tribal rights by conferring on a state powers inconsistent with unrestricted tribal rights. *See* F. Cohen, *Handbook of Federal Indian Law,* at 117, 286 (U.N.M. ed. 1971). Within the limited area of the reservation occupied by the Big Bend taking, this Court concludes that Congress intended Lower Brule member hunting and fishing to be subject to State regulation.[15]

The express language of the 1944 Flood Control Act establishes that Congress intended all citizens hunting and fishing within the boundaries of the public park and recreational facilities at dam and reservoir projects to be subject to the same, uniform hunting and fishing regulations, including state game and fish laws. 16 U.S.C. § 460d. To accomplish this end, Congress abrogated the Tribe's treaty hunting and fishing rights within the taken areas. Congress deleted a provision in a draft of P.L. 87-734 which would have permitted member hunting and fishing "without regard to state law." And Congress conferred upon tribal members the restricted right to hunt and fish within the taken areas "subject to regulations governing the corresponding use by other citizens of the United States." State hunting and fishing regulations clearly are among the laws which govern the conduct of other citizens within the taken areas.

This Court cannot hold that federal law preempts the application of State hunting and fishing regulations to tribal members. The taken areas are subject to federal regulation under a statute which governs the operation of public parks and recreational facilities at water resource development projects. 16 U.S.C. § 460d. This statute expressly preserves the application of state game and fish laws and reveals a total lack of intent to preempt State law by direct federal fish and game regulation. Federal law governing the dam and reservoir projects is totally consistent with Congress'· express preservation of state fish and game regulation in other areas under potentially exclusive federal control. *See, e.g.,* 10 U.S.C. § 2671 (military reservations and facilities); 16 U.S.C. § 528 (national forests); *id.* § 668dd(c) (National Wildlife Refuge System); *id.* § 670h(b) and (c)(4), 670i(b)(4), 670k(6) (other public lands). Even within these areas, if Congress intended not to extinguish Indian treaty rights, it knew how to do so. In 10 U.S.C. § 2671(d) (military reservations), Congress provided that "[t]his section does not modify any rights granted by treaty or otherwise to any Indian tribe or to the members thereof." Congress declined to so preserve the treaty hunting and fishing rights of the Lower Brule Tribe within the taken areas.[16]

Furthermore, this Court cannot hold that State regulation of member hunting and fishing infringes upon the right of tribal self-government. In *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959), the Supreme Court stated: "[e]ssentially, absent governing acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." This "infringement" test, however, need not be reached in a case in which a congressional act controls. Getches, et al., *Federal Indian Law: Cases and Materials, supra,* at 287. This Court holds that the 1944 Flood Control Act and P.L. 87-734 constitute governing acts of Congress with respect to member hunting and fishing within the Big Bend taking area on the Reservation. Congress has de-

---

**15.** The State makes no claim that it may regulate member hunting and fishing on tribal or trust lands elsewhere within the reservation.

**16.** Congress also knew how to reserve treaty hunting and fishing rights upon tribal lands which were ceded or removed from reservation status, but did not do so in this case. *Washington v. Washington State Commercial Passenger Fishing Vessel Assoc.,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *Kimball v. Callahan,* 590 F.2d 768 (9th Cir. 1979).

termined that the right of tribal self-government in the area taken for the dam and reservoir projects does not include the right of tribal members to hunt and fish free of State regulation.

In summary, this Court is well aware of general principles in Indian law which properly limit the reach of state authority in Indian country. But *Wounded Knee* compels the conclusion that Congress changed the Reservation to an area without defined or identifiable boundaries. To avoid the corresponding jurisdictional confusion over hunting and fishing, Congress provided that tribal hunting and fishing rights, within the *entire* taken area, were subject to the same regulations which govern the corresponding use of other citizens of the United States. This Court will not adopt a contrary, strained interpretation of the acts which defeats Congress' clear intent to establish uniform federal and state regulation of hunting and fishing by all persons within the areas taken from the Lower Brule Tribe.[17]

## 2. REGULATION OF NON–MEMBER HUNTING AND FISHING WITHIN THE TAKEN AREAS [18]

■ This Court has held that the face of the relevant Acts, together with the legislative history, establishes that Congress intended the State to exercise exclusive regulatory jurisdiction over hunting and fishing by all persons within the taken areas. Beyond the language of the Acts, however,

the exclusive jurisdiction of the State over non-member hunting and fishing is supported by reference to otherwise applicable principles of law.

First, there can be no dispute that the State's jurisdiction over non-members within the Fort Randall taking area is exclusive. This taking area is outside the exterior boundaries of the Lower Brule Reservation, and the Tribe makes no claim that its laws could apply outside Reservation boundaries. The issue of state jurisdiction over non-members within the Big Bend taking area, on the Reservation, is more complex.

■ It is generally recognized that a state has jurisdiction to enforce its hunting and fishing laws with respect to non-members within the boundaries of a reservation unless precluded by an act of Congress or unless such enforcement would interfere with tribal self-government on the reservation. *Confederated Tribes of the Colville Indian Reservation v. Washington,* 591 F.2d 89 (9th Cir. 1979); *United States v. Sanford,* 547 F.2d 1085, 1089 (9th Cir. 1976); *State v. Danielson,* 427 P.2d 689, 692–693 (Mont.1967); *United States v. Montana,* 604 F.2d 1162, 1171 (9th Cir. 1979), *reversed* on other grounds, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). No act of Congress precludes State jurisdiction over non-members in this case.[19] This Court further concludes that exclusive State jurisdiction over non-members does not infringe upon tribal self-government.

**17.** The policies against the confused pattern of jurisdiction described earlier in this opinion are so strong that the Supreme Court indicated such an impractical result is not to be imputed to Congress without specific language to that effect. *See, Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 478, 96 S.Ct. 1634, 1643, 48 L.Ed.2d 96 (1976); *Seymour v. Superintendent,* 368 U.S. 351, 358, 82 S.Ct. 424, 428, 7 L.Ed.2d 346 (1962); *United States v. Long Elk,* 565 F.2d at 1039, n. 12. Specific language recognizing indiscreet jurisdictional boundaries on land or water, for hunting and fishing regulation, is absent from the relevant Acts.

**18.** In order to establish regulatory jurisdiction over the area, the Tribe and the State made competing claims to ownership of the bed of the Missouri River. The same issue was raised in other Indian cases concerning regulatory jur-

isdiction. *See, Confederated Salish and Kootenai Tribes v. Namen,* 665 F.2d 951 (9th Cir. 1982); *State of Wisconsin v. Baker,* 524 F.Supp. 726 (W.D.Wis.1981); *Puyallup Tribe v. Port of Tacoma,* 525 F.Supp. 65 (W.D.Wash. 1981). It is clear, however, in this case, that the United States intended to and did acquire any interest of the Tribe within the bed of the River. Further, for the reasons set out in this opinion, the Court can determine the extent of the regulatory jurisdiction of the Tribe and the State in this area without reference to or ruling upon the ownership of the riverbed.

**19.** It is true that the State, upon entering the Union, agreed to disclaim certain rights and interests in Indian land and agreed that "Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." South Dakota Enabling Act, § 4, 25

The United States acquired fee title to the land taken for the Big Bend project. P.L. 87–734. The lands are no longer tribal or trust lands. The United States opened these lands to public use consistent with the general purposes of the dam and reservoir projects. Thus, the status of these lands is identical to that of non-member-owned fee land. In *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Supreme Court held that the Crow Tribe had no power to regulate non-member hunting and fishing on lands owned in fee by non-members. The Court stated that the dependent status of Indian tribes implicitly divested them of powers over relations with non-Indians. The "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." 101 S.Ct. at 1257. The Court rejected the Crow Tribe's claims of jurisdiction over non-members based upon the 1868 Treaty of Fort Laramie, the federal trespass statute, 18 U.S.C. § 1165, and the doctrine of inherent tribal sovereignty.

Following the decision in *Montana v. United States*, the Court vacated the Tenth Circuit's decision in *Mescalero Apache Tribe v. New Mexico*, 630 F.2d 724 (10th Cir. 1980), *vacated* and *remanded*, 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234 (1981), that the State of New Mexico could not apply its hunting and fishing laws to any person on the reservation. Following the *Montana* decision, other courts recognized the exclusive authority of a state to regulate non-member hunting and fishing activities on non-Indian lands within a reservation.

*White Earth Bank of Chippewa Indians v. Alexander*, 518 F.Supp. 527 (D.Minn.1981); *State of Wisconsin v. Baker*, 524 F.Supp. 726 (W.D.Wis.1981); *Ute Indian Tribe v. State of Utah*, 521 F.Supp. 1072 (D.Utah 1981).

The Supreme Court, however, recognized some exceptions to the rule of implied divestiture of tribal powers over non-member conduct. "A tribe may retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or the welfare of the tribe." *Montana v. United States*, 101 S.Ct. at 1258.[20] Responding to this exception, some courts recognized tribal powers to enforce against non-Indians a tribe's building, health and safety regulations, *Cardin v. De La Cruz*, 671 F.2d 363 (9th Cir. 1982), tribal ordinances governing riparian rights of non-Indian landowners, *Confederated Salish and Kootenai Tribes v. Namen*, 665 F.2d 951 (9th Cir. 1982), and tribal regulations governing the right to use scarce water resources on a reservation. *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981). Significantly, the challenged conduct in each of these cases was not subject to state regulation. Thus, the threatening conduct would continue unregulated if tribal authority had been divested. The potential danger to tribal political or economic security, health or welfare, was both clear and significant.

Non-member hunting or fishing within the Big Bend taking area does not threaten the political or economic security, health or welfare of the Tribe. Non-member hunting and fishing in this area is subject to com-

Stat. 676. *See also*, South Dakota Constitution, Article XXII. This disclaimer, however, does not operate to preclude the State from regulating non-member hunting and fishing on a reservation. *White Mountain Apache Tribe v. State of Arizona*, 649 F.2d 1274, 1280 (9th Cir. 1981). The Enabling Acts required states to disclaim their proprietary interest in Indian land, but not their governmental or regulatory authority over their land. *Organized Village of Kake v. Egan*, 369 U.S. 60, 67–69, 82 S.Ct. 562, 566–567, 7 L.Ed.2d 573 (1962).

**20.** The Supreme Court recognized a second exception to exclusive state jurisdiction over non-member conduct on non-Indian owned fee land. "A tribe may regulate . . . the activities of non-members who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. United States*, 101 S.Ct. at 1258. The Court rejected any suggestion, however, that non-Indians who hunt or fish on non-Indian fee land enter any consensual agreements or dealings with a tribe. *Id.*

prehensive federal and state regulation. No credible claim can be made that non-member fishing in the reservoirs so depletes resources needed for tribal subsistence, as to require the additional imposition of tribal regulations. The Tribe has not alleged that the State inadequately regulates non-member conduct and so impairs the Tribe's remaining rights in these areas. This Court finds and concludes that non-member hunting and fishing within the Big Bend taking area bears no clear relationship to the self-government or political integrity of the Tribe. The record shows that since the construction of the Big Bend and Fort Randall projects, the Tribe has accommodated itself to State regulation of non-members within the entire taken areas. *See, Montana v. United States*, 101 S.Ct. at 1258.

This Court acknowledges the efforts of the Tribe to develop hunting and fishing reserves as a means of conserving resources and raising revenue. Undoubtedly, this decision will affect the ability of the Tribe to utilize hunting and fishing within the taken areas as a means of economic development. But the Tribe has no vested right to the revenue it might derive from the enforcement of its laws with respect to non-member hunting and fishing within the Big Bend taking area. *White Mountain Apache Tribe v. State of Arizona*, 649 F.2d 1274, 1284 (9th Cir. 1981). This Court concludes that Congress restricted the rights or privileges of the Tribe within the taken areas consistent with its plan to maintain the areas under primary federal regulation, for public uses and purposes.

Accordingly, the Court declares that:

1) The Lower Brule Sioux Reservation, as established by the 1868 Fort Laramie Treaty and the Act of March 2, 1889, 25 Stat. 888, was diminished to the extent of the United States' acquisition of tribal and trust lands for the Fort Randall Dam and Reservoir project, P.L. 85–923; the Reservation was not diminished to the extent of the taking of tribal and trust lands for the Big Bend Dam and Reservoir project, P.L. 87–734.

2) Congress abrogated the 1868 Treaty to the extent that the treaty reserved to the Tribe and its members within the Fort Randall and Big Bend taking areas, (a) the right to exclusively use and occupy the areas, and, (b) the right to hunt and fish in the areas free of State regulation.

3) Pursuant to the authority recognized in the taking Acts, P.L. 85–923 and P.L. 87–734, and granted by the 1944 Flood Control Act, 16 U.S.C. § 460d, the State has exclusive jurisdiction to regulate hunting and fishing by all persons within the areas acquired by the United States for the Fort Randall and Big Bend Dam and Reservoir projects. The Tribe's request that the State be permanently enjoined from enforcing its game and fish laws within the areas acquired for the dam and reservoir projects, is denied. This Court reserves its ruling upon the parties' cross-motions for summary judgment concerning hunting and fishing on the reservation outside the taking areas. To the extent set forth above, the State's motion for summary judgment is granted, and the Tribe's motion for summary judgment, denied.

The above constitutes this Court's findings of fact and conclusions of law in this matter.