No. 96-1692

Lower Brule Sioux Tribe;  *
                            *
        Appellant;    *
                            *
     v.                *  Appeal from the United States
                            *  District Court for the
State of South Dakota; John   *  District of South Dakota.
Cooper, Secretary, Division   *
of Game, Fish & Parks for the  *
State of South Dakota;       *
                            *
        Appelles.     *

Submitted:  October 24, 1996

Filed:  January 9, 1997

Before BOWMAN, HEANEY, and BEAM, Circuit Judges.

HEANEY, Circuit Judge.

    This case involves a long-standing dispute between the Lower Brule Sioux Tribe ("Tribe") and the State of South Dakota and the Secretary of the State Game, Fish & Parks Division ("State") concerning regulatory jurisdiction over hunting and fishing by nonmembers of the Tribe on nonmember-owned fee lands and waters and taken areas within the boundaries of the Lower Brule Sioux Reservation ("Reservation"). The Tribe brought this action to enjoin the State from enforcing its hunting and fishing laws over any person within the boundaries of the Reservation. The Tribe also sought declaratory relief that the State is barred from exercising any regulatory authority over hunting or fishing within the Reservation. Since this litigation began in 1980, the Supreme Court has handed down several important decisions relating to

Indian sovereignty and tribal regulatory authority on different land classifications within Reservation boundries.  Accordingly, the district court determined that this action is substantially controlled by South Dakota v. Bourland ("Bourland III"), 508 U.S. 679 (1993), rev'g, 949 F.2d 984 (8th Cir. 1991), Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation, 492 U.S. 408 (1989) (plurality), and Montana v. United States, 450 U.S. 544 (1981).  Following this line of authority, the district court granted the State's motion for summary judgment.  We agree that this result follows Supreme Court precedent and affirm.

I.

This case began over sixteen years ago when the Tribe sought to enjoin the State from enforcing its fish and wildlife regulations on fee lands and taken lands within the boundaries of the Reservation and to obtain a declaratory judgment that the Tribe has exclusive regulatory jurisdiction over hunting and fishing by any person within Reservation boundaries.  In the first phase of the litigation, the district court reserved ruling on matters pertaining to fee lands.  With respect to lands taken by the Army Corps of Engineers for flood control projects at Fort Randall and Big Bend, the court held that the respective taking acts diminished the Reservation thereby divesting the Tribe of jurisdiction over even tribal members on those lands.  Lower Brule Sioux Tribe v. South Dakota ("Lower Brule I"), 540 F. Supp. 276, 292 (D.S.D. 1982).  Our court reversed, holding that the Tribe had exclusive jurisdiction to regulate hunting and fishing by tribal members in the taken areas and remanding for reconsideration of who has jurisdiction to regulate hunting and fishing by nonmembers within the Fort Randall and Big Bend taken areas.  Lower Brule Sioux Tribe v. South Dakota ("Lower Brule II"), 711 F.2d 809, 813, 827 (8th Cir. 1983).  Before trial, however, the Tribe and the State entered into a five-year cooperation agreement.  Unfortunately, this agreement was not renewed; and when it expired on October 24, 1991,

2

the Tribe brought this action to enjoin the State from enforcing its hunting and fishing laws over any person on fee lands and taken lands within the boundaries of the Reservation and to bar the State from attempting to regulate hunting and fishing on those lands in the future. The district court entered a preliminary injunction against the State on November 13, 1991, in effect, continuing the terms of the expired five-year agreement between the parties. After extensive discovery by both sides, the State filed a motion for summary judgment on September 11, 1995. On February 8, 1996, after the Tribe filed its second response to the motion, the district court granted the State's motion for summary judgment. Lower Brule Sioux Tribe v. South Dakota ("Lower Brule III"), 917 F. Supp. 1434, 1457 (D.S.D. 1996). Applying the analytical framework of Montana, Bourland III, and Brendale, the court held (1) Congress has abrogated any treaty rights that provided the Tribe with the authority to regulate hunting and fishing by nonmembers on both fee lands and waters and in the taken areas; (2) the Tribe's inherent sovereignty does not extend to the regulation of hunting and fishing by nonmembers on fee or taken lands either by virtue of a consensual relationship with the Tribe or because of a threat to the political integrity, economic security, or health and welfare of the Tribe; and (3) the State has exclusive jurisdiction to regulate nonmember hunting and fishing within both the fee and taken areas at issue. The Tribe appeals, arguing both that there are disputed material facts that make summary judgment inappropriate and that the court erred as a matter of law in determining that the State has exclusive jurisdiction to regulate hunting and fishing on non-trust lands within the Reservation.

II.

To provide some context for this dispute, we begin with a basic history of the Lower Brule Sioux Reservation. A more comprehensive background discussion, with particular detail about

3

the relevant treaties and taking acts, is contained in <u>Lower Brule I</u>, 540 F. Supp. at 278-86.

The Fort Laramie Treaties of 1851, 11 Stat. 749 (1851), and 1868, 15 Stat 635 (1868), established the boundaries of the Great Sioux Nation. <u>See</u> <u>United States v. Sioux Nation of Indians</u>, 448 U.S. 371 (1980). The Lower Brule Sioux Reservation was established as part of a March 2, 1890 act of Congress that divided the Great Sioux Nation into five smaller ones. <u>See</u> 25 Stat. 888 (1889). The Reservation is situated in central South Dakota in northeastern Lyman County and extends slightly into the southeastern corner of Stanley County. The Reservation is bounded on the northeast and east by the Missouri River. The original area of the Reservation, which consisted of 446,500 acres, was twice diminished by Congress: first by the Act of March 3, 1899, 30 Stat. 1362 (1899), and second by the Act of April 21, 1906, 34 Stat. 124 (1906). The present Reservation consists of approximately 235,800 acres.

The two classifications of Reservation areas at issue in this litigation are nonmember-owned fee lands and waters and the areas taken by the Army Corps of Engineers for two flood control projects. Approximately 56,634 acres, or roughly one-quarter of the total Reservation land, is deeded land held in fee by either members or nonmembers of the Tribe. Under the Indian General Allotment Act, 24 Stat. 388 (1887), significant portions of the Reservation were allotted to individual tribal members as part of Congress's widespread attempt to disestablish reservations and to force Indians to assimilate into the dominant white culture modeled on individual property ownership. After a period of years during which the allotments were held in trust, fee patents were issued. <u>See</u> <u>id.</u> at 398 § 5. Assisted by legislation aimed at opening the Reservation to non-Indian development, <u>see</u>, <u>e.g.</u>, 30 Stat. 1362 (1899), 34 Stat. 124 (1906), piecemeal sales of fee lands up to the time of the Indian Reorganization Act of 1934 created what is often called a "checkerboard" map of trust lands, tribal lands, allotted

4

lands, and fee lands.  The boundaries between the variously classified lands are not marked, making it difficult for persons on the Reservation to determine the ownership status of any given site.

The other relevant land classification is land taken under the United States' power of eminent domain for construction of two projects as part of a comprehensive flood control plan for the Missouri River as authorized by the Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887 (1944). Two taking Acts established the territory now at issue:  the Fort Randall Taking Act, Pub. L. No. 85-923, 72 Stat. 1773 (1958), and the Big Bend Taking Act, Pub. L. No. 87-734, 76 Stat. 698 (1962).  Collectively, the projects required the taking of 22,296 acres of Indian lands.  Under the terms of the Fort Randall Taking Act, the Tribe maintained the right to graze stock on the land and a right of free access for members to hunt and fish.  According to the Big Bend Taking Act, the United States acquired the "entire interest" of the Tribe, including gravel and any interest the Tribe may have had within the bed of the Missouri River; the Tribe maintained the right to graze on the land and free access for hunting and fishing.

III.

We review the district court's grant of summary judgment de novo, applying the same standard as the district court.  Lebus v. Northwestern Mut. Life Ins. Co., 55 F.3d 1374, 1376 (8th Cir. 1995).  Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  As explained by the district court:

> [T]he facts and inferences from those facts are viewed in
> the light most favorable to the nonmoving party and the
> burden is placed on the moving party to establish both

5

> the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-90 (1986).  Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.

<u>Id.</u>

We must examine the evidence in the context of the legal issues involved.  Thus, it is not enough that there are factual disputes between the parties, "the dispute[s] must be outcome determinative under prevailing law."  <u>Holloway v. Pigman</u>, 884 F.2d 365, 366 (8th Cir. 1992).  We agree with the district court that under existing precedent summary judgment is appropriate to resolve this dispute.  A careful review of the record, including the Tribe's response to the State's motion for summary judgment and response to the State's statement of material facts, reveals that to the extent that the parties disagree on factual matters, none of the disputes is outcome determinative once put in legal context.[1]  Thus, we agree that the record presents no genuine issues of disputed material facts.

IV.

Tribal jurisdiction to regulate hunting and fishing by nonmembers on nonmember-owned fee lands and taken lands derives from either of two sources:  treaty rights or inherent tribal sovereignty.  <u>See</u> <u>Montana v. United States</u>, 450 U.S. 544, 556-58 (1981).  We examine each source of jurisdiction separately as it applies to the different land classifications.

---

[1]The Tribe raises numerous factual disputes which it believes should have prevented the district court from issuing summary judgment.  After careful consideration of each of these claims, we have determined that none are material to the resolution of the issues presented in this case.

6

A.    Fee Lands and Waters


   1. Treaty Rights


   Consistent with Supreme Court precedent, the district court held that any right to regulate hunting and fishing by nonmembers on nonmember-owned fee lands originally obtained by the Tribe under the Fort Laramie Treaty of 1868 was abrogated by the Indian General Allotment Act of 1887. Lower Brule III, 917 F. Supp at 1446. In 1868, the Fort Laramie Treaty gave the Tribe the right of "absolute and undisturbed use and occupation" of Reservation lands. 15 Stat. 636. This authority to exclude nonmembers from the land also carried the lesser authority to regulate the activities of nonmembers to whom the Tribe permitted access. See Montana, 450 U.S. at 559; Bourland III, 508 U.S. at 688-89. Treaty rights obtained by the Tribe under the Fort Laramie Treaty, however, were abrogated by Congress with the passage of the General Indian Allotment Act of 1887. Brendale, 492 U.S. at 425; Montana, 450 U.S. at 559. As the Court explains:


>    Montana and Brendale establish that when an Indian tribe
>    conveys ownership of its tribal lands to non-Indians, it
>    loses any former right of absolute and exclusive use and
>    occupation of the conveyed lands. The abrogation of this
>    greater right . . . implies the loss of the regulatory
>    jurisdiction over the use of the lands by others.


Bourland III, 508 U.S. at 689. After the General Indian Allotment Act, the Tribe no longer retains the exclusive use and benefit of the land, and Congress did not expressly delegate authority to the Tribe to regulate nonmember conduct on nonmember-owned fee lands. Therefore, whatever regulatory power the Tribe has under the treaty no longer extends to lands held in fee by nonmembers.

2. Inherent Sovereignty

Indian tribes have inherent sovereignty independent of treaty rights and the authority derived from their power to exclude nonmembers from tribal lands. Despite their dependence on the United States, tribes generally retain sovereignty in the form of tribal self-governance and control over other aspects of tribal internal affairs. See Montana, 450 U.S. at 564. A tribe's inherent sovereignty, however, is divested to the extent that it is inconsistent with the tribes's dependent status, that is, "to the extent it involves a tribe's 'external relations.'" Brendale, 492 U.S. at 425-26 (quoting United States v. Wheeler, 435 U.S. 313, 326 (1978)); see also Montana, 450 U.S. at 564 ("[E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.").

In Montana, the Supreme Court recognized two possible exceptions to the general rule that inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. 450 U.S. at 565-66. First, "[a] tribe may regulate . . . the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements." Id. at 565. Second, a tribe may regulate conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566.

We agree with the district court that the first Montana exception is inapplicable. Neither the original title deeds for the lands nor the purchase of hunting and fishing licenses give rise to the requisite consensual relationship between the Tribe and nonmembers who hunt and fish on the fee lands. See South Dakota v.

Bourland ("Bourland IV"), 39 F.3d 868, 869 (8th Cir. 1994); Montana, 450 U.S. at 566.

The Tribe also argues that the record supports a finding that, under the second Montana exception, it retains the power to regulate hunting and fishing by nonmembers on nonmember-owned fee lands because the conduct affects the Tribe's economic, political, and social welfare. Specifically, the Tribe asserts that state regulation will: (1) deprive the Tribe of licensing revenues; (2) adversely affect game populations on trust lands; and (3) cause confusion and discourage the use of the Reservation due to the complexities of complying with separate laws in adjoining areas.[2] While noting that these same factors were present in either or both Montana and Bourland III and that the adverse impact was insufficient to establish tribal jurisdiction, the district court conducted the necessary "particularized inquiry into the unique facts and circumstances surrounding the Lower Brule Reservation and the Lower Brule Tribe." Lower Brule III, 917 F. Supp. at 1447; see also Brendale, 492 U.S. at 428-30. The court specifically took into account the Tribe's history, economy, and population mix. Lower Brule III, 917 F. Supp. at 1447.

The court concluded that State regulation of nonmember hunting and fishing does not threaten the political integrity, economic security, or health and welfare of the Tribe. Id. at 1449.[3] With

_____

[2]In its motion opposing summary judgment before the district court the Tribe additionally argued that it was adversely impacted by the lost job opportunities for its members who would perform regulatory functions. The Tribe appears to have abandoned this argument on appeal. Although we do not specifically address this issue, we note that our decision would not be altered by the inclusion of this claim.

[3]The State asks us to adopt the more stringent standard set forth in Justice White's plurality opinion in Brendale. In Brendale, Justice White wrote that for an Indian tribe to retain jurisdiction over nonmembers pursuant to the second Montana exception, "[t]he impact [on tribal interests] must be demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the tribe." Brendale, 492 U.S. at 431 (emphasis added); see also Bourland IV, 39 F.3d at 870 n.4. As in Bourland IV, we need not determine whether the Brendale

respect to licensing fees, the court found that revenue from licensing accounts for only a small fraction of the dollars spent by hunters and fishers and that, in light of the economic strength of the Tribe, lost revenues do not pose a significant threat to the economic security of the Tribe. With respect to migrating game populations, the court acknowledged that wildlife herds migrate throughout the Reservation and that nonmember hunting on nonmember-owned fee lands will reduce the overall deer population on tribal land to some extent. Yet, the court found no evidence on the record to support a determination that the harvesting of deer on nonmember fee lands threatened the overall welfare of the Tribe. See Bourland IV, 39 F.3d at 870 (noting that incidents of deer harvesting by nonmembers are "undeniably vexatious to the individual Indians affected" but do not amount to a direct threat to the welfare of the Tribe as a whole). For example, there is no evidence that a significant number of tribal members depend on wild game for their sustenance or livelihood. Finally, the court acknowledged that there are unmarked boundaries between the various types of Reservation land and that separate laws enforced by distinct governments on adjoining lands can create some confusion. Nonetheless, the court recognized that the Supreme Court has authorized exactly this kind of "checkerboard" jurisdiction by mandating that neighboring lands be subject to different regulatory authorities. Lower Brule III, 917 F. Supp. at 1448 (citing Bourland II, 949 F.2d at 996).

---

plurality opinion modified the second Montana exception. The district court explicitly analyzed the Tribe's arguments under the framework of Montana, avoiding the more stringent arguable modification in Brendale. Lower Brule III, 917 F. Supp. at 1446. We do the same. We note only that affirmance under the less stringent standard as originally articulated in Montana necessarily implies a failure to satisfy a more stringent application of the exception. See Bourland IV, 39 F.3d at 870 n.4.

10

We hold that the district court did not err in its determination that the Tribe failed to establish sufficient evidence to prevent summary judgment on the jurisdictional issue over nonmember-owned fee lands and waters. We also find no error in the court's conclusion that no principles of federal Indian law preclude the State from lawfully exercising jurisdiction over nonmembers on the fee lands and waters at issue. We hasten to add, however, that the Tribe may seek relief in the district court in the future if circumstances change in kind or degree so as to directly affect or threaten the political integrity, economic security, or health and welfare of the Tribe as a whole. See Bourland IV, 39 F.3d at 871.

B.   Taken Lands

Also at issue is jurisdiction over hunting and fishing by nonmembers on lands and waters located in the Fort Randall and Big Bend taken areas within the boundaries of the Reservation. The district court held that Congress's exercise of eminent domain abrogated the Tribe's treaty rights and that the Tribe's inherent sovereignty does not extend to the regulation of hunting and fishing by nonmembers in the taken areas.

As the Supreme Court explains, "regardless of whether land is conveyed pursuant to an Act of Congress for homesteading or for flood control purposes, when Congress has broadly opened up such land to non-Indians, the effect of the transfer is the destruction of pre-existing Indian rights to regulatory control." Bourland III, 508 U.S. at 692 (footnote omitted). Thus, it is necessary to look to the language of the Acts which effectuated the takings. Section 1 of the Fort Randall Taking Act, Pub. L. No. 85-923, 72 Stat. 1773, provides that the payments by the United States to the Lower Brule Sioux Tribe were in "settlement of all claims, rights, and demands of said tribe." Section 1 of the Big Bend Taking Act, Pub. L. No. 87-734, 76 Stat. 698, is almost identical. Both

11

provisions indicate that there was a mutual understanding between the United States and the Tribe that the Acts set forth all of the terms of the transaction and all the rights the Tribe would retain under the agreements. Section 5 of the Fort Randall Taking Act explicitly provides that the Tribe retains two rights, without cost: first, to graze livestock and, second, to hunt and fish in the taken area subject to the regulations governing the corresponding use of the land by other United States citizens. Similarly, Section 10 of the Big Bend Taking Act reserves for the Tribe and its individual members the right to hunt and fish on the taken area subject to the laws applicable to other citizens doing the same.

The provisions set out above are almost identical to Sections 2 and 10 of the Cheyenne River Act, 68 Stat. 1191 (1954) (taking land for the Oahe Dam and Reservoir project in furtherance of the Flood Control Act of 1944), construed by the Supreme Court in Bourland III. In that case the Court concluded, "Congress, through the Flood Control and Cheyenne River Acts eliminated the Tribe's power to exclude non-Indians from these lands, and with that the incidental regulatory jurisdiction formerly enjoyed by the Tribe [pursuant to the Fort Laramie Treaty of 1868]." Bourland III, 508 U.S. at 689. Similarly, the Fort Randall and Big Bend Taking Acts must be construed to deprive the Tribe of any treaty right to regulate nonmember hunting and fishing in the taken areas. Thus, the district court correctly reached this conclusion.

The Tribe does not challenge the court's conclusion as to extinguishment of treaty rights[4] so much as it asserts that only the federal government, not the State, has jurisdiction to regulate nonmembers' activities in the taken areas. It is clear that

---

[4]Nor does the Tribe challenge the district court's conclusion that neither Montana exception is applicable and, therefore, the Tribe does not have inherent authority to regulate the hunting and fishing by nonmembers on the taken lands.

12

Congress provided the Army Corps of Engineers with the regulatory control over the taken areas. 16 U.S.C. § 460d; see also Bourland III, 508 U.S. at 690. The district court determined that the Corps has the authority to relegate partial jurisdiction over the taken areas to the State and that the Corps has in fact entrusted the State with that regulatory authority. We reject the Tribe's arguments that Congress preempted all State jurisdiction and agree with the district court's conclusions.

It is apparent from the language of the Flood Control Act of 1944 that Congress did not preempt state law. The Act provides: "No use of any area to which [the Flood Control Act] applies shall be permitted which is inconsistent with the laws for the protection of fish and game of the State in which such area is situated." 16 U.S.C. § 460d (emphasis added). Also, both the Fort Randall and Big Bend Taking Acts grant tribal members permission to hunt and fish within the taken areas, "subject, however, to regulations governing the corresponding use by other citizens of the United States." Fort Randall Taking Act, § 5; Big Bend Taking Act, § 10. This language recognizes that other regulations may impact the lands. See Bourland III, 508 U.S. at 691. In light of the fact that there are no comprehensive federal hunting and fishing regulations in effect for the taken areas, we agree with the district court's observation that this language indicates Congress anticipated that the federal government would rely heavily on state regulation.

Moreover, the federal government has consistently expressed the view that the State has jurisdiction to regulate hunting and fishing by nonmembers on the taken lands. In a March 6, 1976 letter to the Tribe's Chairman, a Corps engineer stated in relevant part:

> That lands purchased and/or condemned by the United
> States for the Ft. Randall and Big Bend Projects were
> returned to the public domain, and, as such, fall within

13

the civil and criminal, or legislative jurisdiction of the State of South Dakota.

That the fish and game laws of the State of South Dakota are the only such laws that apply to these areas which were formerly owned by the Lower Brule Sioux Tribe and its members.

(App. of Appellee II at B.7 (Letter from Col. Russell A. Glen, District Engineer for the Army Corps of Engineers to Tribal Chairman Michael B. Jandreau)). Similarly, in a September 15, 1986 letter, the Corps reiterated its position:

[R]egulation of hunting and fishing on Corps project lands in South Dakota is a matter of State law. This was clearly the intent of Section 4 of the 1944 Flood Control Act . . . . As you know, the Corps has only proprietal jurisdiction over its project lands along the mainstem of the Missouri River in South Dakota. Such lands are subject to state civil and criminal jurisdiction.

(App. of Appellee II at B.9 (Letter from Col. Steven G. West, District Engineer for the Army Corp of Engineers to Secretary Jeff Stingley of South Dakota Fish and Parks)). The rules and regulations set forth by the Corps to govern public use of the taken lands and waters likewise provide for application of state laws. See, e.g., 36 C.F.R. § 327.8 (1995) (providing that all federal, state, and local laws pertaining to hunting, fishing, and trapping apply on project lands); 36 C.F.R. § 327.26 (1995) (similar). We agree with the district court that the Army Corps of Engineers has the authority to delegate regulatory and enforcement responsibilities to the State. We also agree that the Corps has clearly manifested its intention to do so on the projects lands and waters at issue in this case.

V.

In conclusion, we affirm the district court's holding that the State has exclusive regulatory jurisdiction over hunting and

14

fishing by nonmembers on both nonmember-owned fee lands and the taken area within the Reservation.

BEAM, Circuit Judge, concurring and dissenting.

Judge Heaney has written a very well-reasoned opinion for the court in which I concur, except for part IV A.2. dealing with inherent sovereignty. For the reasons I advanced in A-1 Contractors v. Strate, 76 F.3d 930, 941-42 (8th Cir.), cert. granted, 117 U.S. 37 (1996), it is my view that the Tribe has a "valid tribal interest" in the regulation of hunting and fishing activities on all lands, whether tribal, member-owned, or nonmember-owned, within the geographic confines of the reservation. Thus, the second exception set forth in Montana v. United States, 450 U.S. 544, 566 (1981) - holding that a tribe may regulate, as a sovereign, conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe," - requires abatement of South Dakota's effort to invade tribal territory.

I believe that the district court (and this court in affirming the district court) effects an incorrect analysis of the sovereignty issue at play in this case. The court says "[w]e hold that the district court did not err in its determination that the Tribe failed to establish sufficient evidence [of sovereignty] to prevent summary judgment . . . ." Supra at 12. This is not (or at least should not be) the test.

"Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory." United States v. Wheeler, 435 U.S. 313, 323 (1978) (emphasis supplied). Until Congress acts, the Tribe possesses those aspects of sovereignty not withdrawn by treaty or statute. Id. "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty." Iowa Mut. Ins. Co. v.

15

LaPlante, 480 U.S. 9, 18 (1987).  Although speaking specifically  of tribal court jurisdiction, the Supreme Court noted that,  "[c]ivil jurisdiction over such activities [of non-Indians on reservation lands] presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute."  Id. (emphasis supplied). "`Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence . . . is that the sovereign power . . . remains intact.'"  Id. (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 149 n.14 (1982)).

South Dakota asserts its own sovereign power when it regulates hunting and fishing outside of the reservation but within the borders of the State.  The sovereignty of the Tribe over the lands of the reservation when such sovereignty is unencumbered by treaty or federal law, as here, provides equal, if not superior, authority to the Lower Brule government. And the State's sovereignty, it seems to me, in no way attenuates, displaces, or makes subservient the territorial sovereignty of an Indian tribe on reservation lands that also lie within the boundaries of South Dakota -- at least such sovereign power as is necessary to regulate fishing and wildlife activity.  Indeed, we recognize in this very case the authority of the Tribe to regulate these activities on parts of the reservation and its long-standing use of this authority.  Accordingly, there is, in my view, a presumption of Lower Brule sovereign power sufficient to regulate hunting and fishing within the outer boundaries of the reservation (except for the taken lands) since neither treaty nor congressional act has affirmatively abrogated these retained tribal powers, powers that have existed since prior to South Dakota statehood.

Thus, it seems to me that it is South Dakota and not the Tribe that has the "laboring oar" on the issue of fishing and wildlife jurisdiction over nonmember fee lands and waters within the reservation.  In my view, the State has fallen woefully short of

16

sustaining its burden under the rules we apply to motions for summary judgment.

It is well settled that a waiver of tribal sovereign immunity "'cannot be implied but must be unequivocally expressed.'" Santa Clara Pueblo v. Martinez 436 U.S. 49, 58 (1978)(quoting United States v. Testan, 424 U.S. 392, 399 (1976)).  And the Supreme Court has said: "We found [in McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 168 (1973)] a 'deeply rooted' policy in our Nation's history of 'leaving Indians free from state jurisdiction and control.'"  Oklahoma Tax Comm'n v. Sac and Fox Nation, 508 U.S. 114, 123 (1993).  Thus, although not directly on point, these holdings dictate that on the facts of this case, as we presently know them, South Dakota should not be allowed to substitute its sovereign power for the presumptive sovereignty of the Tribe over lands within the reservation.

I do not read the holding in Montana v. United States to be to the contrary.  The issue of inherent sovereignty, or not, is a fact-driven inquiry or, at least, a mixed question of fact and law, and the evidence in this case is significantly different than in Montana.

In Montana, there was a trial at which evidence was adduced by the State showing that Montana had, since 1928, "engaged in an extensive fish-stocking program throughout the waters of the Crow Indian Reservation," United States v. Montana 457 F. Supp. 599, 605 (1978) and that the State had both stocked and introduced non-indigenous game birds and indigenous game animals on reservation lands and areas adjacent to the reservation. Id.  There was also evidence that the Crow Tribe had taken only a mild interest in fishing and wildlife management and then only within about five years or less prior to the 1978 trial.  Id. at 610.  The passage of the Tribal resolution at issue in the litigation prohibiting all nonmembers (including presumably nonmember fee owners) from fishing

17

or hunting within the boundaries of the reservation occurred in 1973.  Id. This action was the first formal exercise of fish and wildlife jurisdiction in tribal history.  Id.  On the other hand, the Supreme Court observed that Montana had  "traditionally exercised 'near exclusive' jurisdiction over hunting and fishing on fee lands within the reservation."  450 U.S. at 564 n.13.  The Supreme Court noted that under the facts of the Montana case there was no showing of a threat to the political or economic security of the Crow Nation, and there was not even an allegation in the complaint concerning impact upon the health and welfare of the Tribe.  Id. at 566. Therefore, it is readily evident that even with the limited facts available in this matter through the cross motions for summary judgment, this is a radically different case than Montana.

If the Tribe were to purchase in fee simple absolute 10,000 acres of prime hunting and fishing land along the Missouri River outside of the reservation, I am confident that the State would seek to apply its sovereign power, and rightly so, to regulate hunting and fishing activities on such non-reservation property.  If the Tribe sought to transfer its sovereignty to the property, the State would make all the same arguments that the Tribe makes in this case as to why such activity would affect the political integrity, the economic security, and the health and welfare of the people of South Dakota.  Those arguments would be valid.  Likewise, the Tribe's well-used sovereign power over fishing and hunting on the Lower Brule Reservation lands should not be squeezed out by the State, whomever may hold title to individual parcels of property in this part of Indian country.

18

Does the overlapping, checkerboard-style wildlife regulation scheme[5] over the lands within the reservation suggested by South Dakota threaten or have some direct effect on the political integrity, the economic security or the health and welfare of the Tribe?  Applying the above examples, policies, and principles to this question, there can be little doubt that the answer is in the affirmative.  And even if the proposition is ambiguous, it is up to South Dakota to rebut with clear and convincing evidence the presumption of tribal sovereignty, not vice versa.

Thus, I respectfully dissent from the holding of the court in part IV A.2. of the opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[5]The court, like the district court, gives too little weight to the Tribe's credible contention that "checkerboard" jurisdiction will impair the Tribe's integrity by creating confusion and discouraging use of the reservation. Supra, at 11; 917 F. Supp. at 1448.  To say that the Supreme Court has "authorized exactly this kind of 'checkerboard' jurisdiction" when the facts so indicate, supra, at 11, does not mean that we are to simply ignore the effect of such a result on the Tribe in considering tribal sovereignty. Indeed in Brendale, the problems presented by inconsistent dual zoning regulations that frustrated tribal land management clearly informed the Court's conclusion that the Yakima Nation retained regulatory authority on fee lands in a portion of the reservation. 497 U.S. at 442-44.