**Charles D. REACH, Jr., Plaintiff,**

v.

**ALLIEDSIGNAL, INC., Defendant.**

**No. 99–0542–CV–W–1.**

United States District Court,
W.D. Missouri,
Western Division.

Sept. 18, 2000.

David W. White, Foland & Wickens, P.C., Kansas City, MO, Stephanie L. Anglin, Overland Park, KS, for plaintiff.

Jill Marchant, Kansas City, MO, Daniel B. Boatright, Spencer, Fane, Britt & Browne, Overland Park, KS, for defendant.

## ORDER

DEAN WHIPPLE, District Judge.

Pending before the Court is Defendant AlliedSignal Inc.'s ("AlliedSignal") Motion for Summary Judgment. Plaintiff Charles D. Reach, Jr., ("Reach") filed this employment-related action, alleging violations of the Americans with Disabilities Act ("ADA"), Family and Medical Leave Act of 1993 ("FMLA"), and the Missouri Human Rights Act ("MHRA"). AlliedSignal has filed suggestions is support, Reach has filed suggestions in opposition, and Allied-Signal has filed a reply. The Court has considered carefully the arguments presented by the parties. For the following reasons, the Court GRANTS AlliedSignal's Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

AlliedSignal is a government contractor that manages and operates a facility owned by the United States Department of Energy ("DOE") known as the Kansas City Plant. Because AlliedSignal's operations are funded by the federal government through the DOE, employment levels at AlliedSignal are determined by the budget allocated to AlliedSignal by the DOE. Budget decisions made by the federal government have led to numerous reductions in force at AlliedSignal during the 1990s, which have reduced AlliedSignal's employment level from nearly 8,500 in the 1980s to less than 3,000 in 1998.

AlliedSignal hired Reach in January of 1990. In February of 1994, Reach accepted a position working in the Condition Assessment Survey ("CAS") group within AlliedSignal's Facilities division, D/100. At

that time, Reach's title was Engineer, Technical Support Staff, the classification he held until the termination of his employment with AlliedSignal in 1997.

In November of 1994, Reach suffered an acute dissection of the ascending aorta, a near fatal event, which resulted in his hospitalization and open-heart surgery. As a result of the dissection, Reach suffers from diminished sight and peripheral vision and ongoing episodes of post-sternotomy pain syndrome. Reach's vision problems affect his ability to read, write, work on a computer, drive, work with certain tools, participate in leisure activities, and perform certain household tasks. Since the original dissection, Reach underwent surgery to remove chest wires that were placed in him, which were causing him severe pain. Ongoing pain episodes also prohibit Reach from doing certain daily activities as he is required to cease all activity until the pain subsides.

Reach returned to work at AlliedSignal on a part-time basis in February 1995, and returned to full-time employment in June 1995. Upon Reach's return to work, he reported to Bob Daniel ("Daniel"), who had become the supervisor over the CAS group in late 1994. Reach's first recollection of Daniel was a visit Daniel paid to Reach while he was in the hospital. Daniel was kind, said a few words to Reach, and gave Reach a hand-crafted Methodist cross that he had made. Reach admits that while he worked for Daniel, he like Daniel very much and worked well under Daniel. He also agrees that he and Daniel had things in common, worked well together, tended to see eye-to-eye on things, and had a good relationship. Reach describes Daniel as a mild-mannered, jovial supervisor who tried to keep employees informed of what was going on in the plant. Reach testified that Daniel was sympathetic toward him with regard to his physical condition, was supportive of Reach's efforts to

return to work following his medical problems, was a very good supervisor, and never said or did anything to suggest that he no longer wished to supervise Reach.

In early 1997, the work of the CAS group began winding down because funding for CAS had changed. Many members of the CAS group were able to return to the positions they held before joining CAS, but Reach and others did not have positions to which they could return (a status Reach describes as "homeless"). At the time CAS was ending, Daniel and Reach discussed where Reach might "find a home" within the company. During that same time period, Daniel was promoted to manager of D/170, a managerial unit within the Facilities division, D/100. Daniel asked Reach to come with him and continue reporting to him in his new assignment. Reach agreed to do so.

In early 1997, Reach was working on several projects for Daniel, some of which were still related to CAS and other which were related to Daniel's new assignment over facilities engineering services. The projects were as follows:

(1) the re-engineering of facilities maintenance services;

(2) a developmental plan for the re-engineering;

(3) the building 91 assessment;

(4) the building 15 assessment;

(5) the column settlement analysis;

(6) Six Sigma green belt training;

(7) the tipped machine project;

(8) the cost-cutting team; and

(9) the formation of a proactive safety team.

Reach admits that at the time of the reduction in force ("RIF") in 1997, most of these assignments/projects were completed or effectively completed. Reach contends that the column settlement project was ongoing and the cost-cutting team was

still meeting. In addition, Reach claims to have just started work on a safety performance project at the time of the 1997 RIF.

On March 17, 1997, AlliedSignal's president announced that cuts in the budget being allocated to AlliedSignal by DOE necessitated a RIF of between 400 and 700 AlliedSignal employees. In June 1997, a voluntary reduction in force ("VRIF") package was offered to nearly all AlliedSignal employees in order to minimize the number of employees to be affected involuntarily. The only employees who were ineligible for the VRIF were those thirty-seven employees whom management had determined to possess "unique skills"— skills that were so important to the business that if an employee with such skills were no longer employed, AlliedSignal would be required to immediately replace that employee from outside the company. The thirty-seven employees with "unique skills" were identified in June of 1997 and notified that they were ineligible for the VRIF and not subject to involuntary RIF.

Phil Neeter ("Neeter"), who had joined AlliedSignal in June of 1996 was the head of the Facilities division, D/100, the organization in which Reach worked at the time of the 1997 RIF. Neeter was responsible for determining which skills in Reach's division constituted unique skills for purposes of exempting employees from both the voluntary and involuntary RIF. Neeter did not identify any skills within the Facilities division as unique and exempt from RIF.

The VRIF resulted in the voluntary separation of 330 AlliedSignal employees. Another 39 employees were transferred to another nuclear weapons site. Following the VRIF, the involuntary RIF took place. Salaried employees were selected for the involuntary RIF according to the "Salaried Associated Reduction In Force Selection Process" (referred to as the "pyramid process"), which was published in the company's internal newsletter on July 17, 1997. On July 31, 1997, the company announced in its internal newsletter what the "RIF units" would be for the upcoming RIF. A "RIF unit" is a group of salaried employees compared to one another for purposes of RIF selection. A RIF unit was comprised of those individuals within the same job classification family, within the same division, who were performing similar job duties, and who could be reassigned to one of the remaining positions in that RIF unit following the RIF (i.e., individuals who were essentially interchangeable). The general rule of RIF unit composition was the job classification family within the managerial unit.

Neeter and his Human Resources generalist, Sandy Patterson,[1] decided how the Facilities organization would be divided into RIF units for purposes of the 1997 RIF. Because Reach was not doing the same work as other Technical Support Staff Engineers in different managerial units, Neeter followed the general rule of RIF construction with regard to the Technical Support Staff Engineers in divisions 100; in other words, each managerial unit of Technical Support Staff Engineers was a stand alone RIF unit. Reach was the only Technical Support Staff Engineer in his managerial unit, unit D/170.

Where the RIF unit had more than one employee, the pyramid process provided the method for comparing the employees to determine which of the employees would be selected for RIF. In RIF units containing only one associate, like Reach, the comparative "pyramid" analysis was unnecessary, and thus, inapplicable. Unless exempt from RIF on the basis of a unique skill, associates in RIF units of one, or single incumbents, were selected for RIF

---

1. Reach does not allege that Sandy Patterson engaged in any discriminatory activity.

based on the elimination of their position, rather than on a comparison with other associates.

In making 1997 RIF decisions in division 100, Neeter consulted with the facilities managers reporting to him about where the Facilities division could afford reductions with the least business disruption. As part of this effort, Neeter and Daniel discussed whether Daniel could more easily reduce his staff by one Facilities Engineer or by the Technical Support Staff Engineer position—two positions Neeter was contemplating eliminating. In response to Neeter's inquiry about which position in Daniel's managerial unit (D/170) could be eliminated, Daniel first indicated his desire that his organization not be impacted at all. When pressed, Daniel identified the Technical Support Staff Engineer position in D/170, Reach's job, as the position that could be eliminated with the least business impact. Daniel identified that position because Reach had already completed most of the project on which he was working. Because of Daniel's personal friendship with Reach, Daniel found the identification of Reach's position as a potential for elimination difficult. Daniel believed, however, that it was the correct assessment for the business. The discussion between Neeter and Daniel was Daniel's only involvement in the RIF selection process. Daniel was not notified of Neeter's decision to eliminate Reach's position until shortly before Neeter notified Reach of that decision.

On October 4, 1997, each of the division directors' RIF recommendations were submitted to and reviewed by a group of senior management members known as the Separation Committee, which made all final RIF decisions after meetings with each of the directors. At that meeting, Phil Neeter recommended to the Separation Committee that Reach's position be eliminated in the RIF because that would have the least impact on the business of the Facilities organization. Ultimately, 43 employees, including Reach, were identified for the involuntary RIF. On October 23, 1997, Neeter and Patterson, the D/100 human resources representative, informed plaintiff that his position had been eliminated and that his employment was being terminated as part of the 1997 RIF.

At the time of the 1997 RIF, Reach could bathe himself, dress himself, drive most of the time, prepare meals for himself, and do basic household chores and yard work. For over eighteen months prior to his termination in the 1997 RIF, Reach had taken less than twelve days of non-vacation leave, an amount which was well within the company's attendance policy and was well below the plant's average absence over the same time period. From the time the involuntary RIF was announced, in mid-July, 1997, until Reach's employment was terminated on October 23, 1997, Reach had taken less than two full days of non-vacation leave. In order to lesson the amount of FMLA leave and absences, Reach used some of his vacation time for medical-related problems. None of Reach's leaves or days off were unpaid. Reach was never denied a request for FMLA leave.

Reach admits that Daniel never did or said anything to suggest that Daniel wanted to target Reach's position for RIF because of his physical condition or leaves of absence. Reach stated that "Phil Neeter ... was very new to his job, he didn't know [Reach] really from anyone in the entire division....[W]hen those [RIF] decision were made Phil Neeter wouldn't know me from hardly anyone else in facilities." Reach admits that he never had any personal conversations with Neeter or any of the Separation Committee members about his medical condition or any of his leaves of absence.

Reach admits that his leaves were fully paid, he was allowed to work essentially part-time at full-pay, he was allowed to work outside the company's flex-time parameters, he was given mostly desk-work during his recuperative period, and he was given a special parking place near the facility.

AlliedSignal has an obligation to account to the DOE for the time AlliedSignal associates spend at work as well as the time they spend away from work on vacation or leave. Reach received a FMLA approval notice indicating that, for the FMLA period from February 15, 1997, to August 15, 1997, he was approved for FMLA leave for one to two doctor visits per quarter. Reach did not notice the limitation of one to two doctor visits per quarter until September of 1997 when Susan Anderson advised him that he had taken FMLA leave in excess of the limitation and that seven hours of this additional FMLA leave was, consequently, to be designated as "unauthorized FMLA" leave. When Reach complained that the limitation was an error, AlliedSignal asked him to provide information from his doctor that there was no limitation on the number of Reach's doctor visits. Reach provided a letter from his doctor, indicating that there were no limits on his FMLA-covered visits. On October 7, 1997, Daniel submitted a memo written by Reach, requesting that the issue be resolved in Reach's favor. Reach admits that AlliedSignal approved the seven hours of FMLA leave and restored his seven hours of vacation time. Reach believes that Neeter was aware of a meeting that took place regarding Reach's use of FMLA leave for his medical condition.

Reach understood that Neeter would be making the decision of which employees would be eliminated in the RIF. Reach testified that AlliedSignal employees Susan Anderson, Dr. Dixon, and Dr. Bennett, targeted him for RIF as a result of the

dispute over the seven hours of FMLA leave. None of these employees played a role or had any decision-making authority in the RIF decision. In addition, the medical department did not share any medical information regarding Reach with Neeter or the Separation Committee. Neeter did not consult with anyone other than the Facilities division managers when identifying potential positions for elimination in the 1997 RIF.

Reach admits that, although he has no evidence connecting what he calls his "difficulties with medical and benefits" to the decision to separate him in the 1997 RIF, he nevertheless brought this lawsuit because:

> [I]t is my belief, my opinion that when all issues are considered in the light of day, fully considered, that there still is no other reason for my having been a candidate, a selection, for the '97 layoff other than the ongoing battles I was having with medical and benefits together and—because it was an ongoing battle with regard to my disabilities and the need, subsequent need, for FMLA time.

[Reach depo. p. 145:17 through 146:20].

After the 1997 RIF, an internal promotion resulted in a vacant position for a Facilities Engineer with an electrical engineering degree in department 172 reporting to Craig Ham. On February 28, 1998, a requisition was approved to hire an electrical engineer from outside the company to fill the opening. The requisition was canceled on May 15, 1998, and the position was never filled. Reach does not have an electrical engineering degree, does not hold himself out to be an electrical engineer, never reported to Craig Ham, and never worked in department 172.

In August of 1998, AlliedSignal posted an internal opening for an Engineer, Facilities, Staff with a bachelor's degree in mechanical, electrical or industrial engineer-

ing to work in department 173 reporting to Dan Gehrke. The position was filled from within the company. Reach's degrees are exclusively in civil engineering, he never worked for department 173, and he never reported to Dan Gehrke.

Reach filed his suit on June 3, 1999. On May 1, 2000, the Court dismissed Count IV, a claim of prima facie tort. AlliedSignal now seeks to have the remaining three Counts dismissed as a matter of law on summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). The facts and inferences from those facts are viewed in the light most favorable to the nonmoving party. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–90, 106 S.Ct. 1348, 1355–58, 89 L.Ed.2d 538 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. *Id.*

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Lower Brule Sioux Tribe v. State of S.D.*, 104 F.3d 1017, 1021 (8th Cir.1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. *Id.* Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. *Id.* Rather, the "disputes must be outcome determina-

tive under prevailing law." *Id.* (citations omitted). Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Demanding more than a metaphysical doubt respects the proper role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

The Eighth Circuit has further qualified the use of summary judgment in employment discrimination cases. "Summary judgments should seldom be used in cases alleging employment discrimination." *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991) (citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990)). "Because employment discrimination cases frequently turn on inferences rather than direct evidence, the court must be particularly deferential to the party opposing summary judgment." *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir. 1997).

## III. DISCUSSION

Reach claims that AlliedSignal unlawfully terminated his employment during the 1997 RIF on the basis of discrimination and retaliation. Reach argues that his termination violated the Americans with Disabilities Act ("ADA") (Count I), 42 U.S.C. §§ 12101 *et seq.*; the Family and Medical Leave Act ("FMLA") (Count II), 28 U.S.C. §§ 2601 *et seq.*; and the Missouri Human Rights Act ("MHRA")

(Count III), Mo.Rev.Stat. §§ 213.010 *et seq.*

## A. Disability Discrimination (Counts I & III)

■ Reach argues that AlliedSignal discriminated against him in violation of the ADA. The ADA prohibits discrimination by an employer "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Similar to the ADA, the MHRA prohibits discriminatory practices against the disabled. *See* Mo.Rev.Stat. § 213.055.1(1)(a). This Court may consider federal law to analyze claims of discrimination under the MHRA. *See McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 510 (8th Cir.1995); *Kramer v. K & S Assocs.*, 942 F.Supp. 444, 446 (E.D.Mo.1996). Therefore, the Court will consider Reach's state and federal claims of disability discrimination under federal law.

■ Reach's claim of discrimination under the ADA is analyzed pursuant to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1021 (8th Cir.1998) (applying *McDonnell Douglas* analysis to claims that do not put forth any direct evidence of discrimination). Under this framework, Reach must first establish a prima facie case of discrimination by showing that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job, with or without accommodation; and (3) he suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination. *See Allen v. Interior Const. Servs., Ltd.*, 214 F.3d 978, 981 (8th Cir.2000). Because Reach's employment was terminated in a RIF, Reach also must show that his disability was a determining factor in his termination. *See Au-*

*cutt v. Six Flags Over Mid–America, Inc.*, 85 F.3d 1311, 1318 (8th Cir.1996). If this showing is made, a rebuttable presumption of discrimination emerges and AlliedSignal must articulate a legitimate, non-discriminatory reason for any adverse employment action taken against Reach. *See Allen,* 214 F.3d at 981. If AlliedSignal proffers such a reason, Reach must demonstrate that this non-discriminatory reason is merely a pretext for intentional discrimination. *See id.*

■ In order to show a prima facie case, Reach must first establish that he is disabled as defined by the ADA. Under the ADA, disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see also Miller v. City of Springfield,* 146 F.3d 612, 614 (8th Cir. 1998). Equal Employment Opportunity Commission ("EEOC") regulations define "impairment" as any physiological disorder, cosmetic disfigurement, or anatomical loss affecting one of the body's systems, or any mental disorder. 29 C.F.R. § 1630.2(h). In order for an impairment to be considered "substantially limiting," the individual must be "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." 29 C.F.R. § 1630.2(j)(1)(i)-(ii). EEOC regulations also define "major life activity" to include activities "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breath-

ing, learning, and working." 29 C.F.R. § 1630.2(i).

AlliedSignal argues that Reach is not disabled because he is not substantially limited in any major life activity. Allied-Signal contends that Reach could bathe himself, dress himself, drive himself places most of the time, prepare meals for himself, and do basic household chores and yard work. It also argues that Reach is not disabled because he did not use the average amount of non-vacation leave in the eighteen months preceding the 1997 RIF. Reach contends that his vision problems alone are disabling. Reach's vision problems affect his ability to read, write, work on a computer, drive, work with certain tools, participate in leisure activities, and perform certain household tasks. In addition, Reach has ongoing episodes of pain, which require him to refrain from all activity until the pain ceases. Furthermore, Reach claims that he has used vacation time for medical problems to alleviate his use of non-vacation time.

■ The Court finds that Reach has a disability under the ADA. Reach has endured open-heart surgery and an additional surgery to remove wires from his chest. Reach's condition has left his eyesight impaired, and seeing is defined as a major life activity. Although a heart condition that does not substantially limit any major life activity is not a disability, *see Weber v. Strippit Inc.*, 186 F.3d 907, 913 (8th Cir. 1999), *cert. denied*, 528 U.S. 1078, 120 S.Ct. 794, 145 L.Ed.2d 670 (2000), Reach's heart condition caused a substantial limitation in Reach's sight. Accordingly, Reach is disabled as defined by the ADA.[2]

■ As part of his prima facie case, Reach also must show that he was qualified to perform the essential functions of his job and that he suffered an adverse employment action. AlliedSignal does not dispute these two elements of Reach's prima facie case. Clearly, Reach suffered an adverse employment action when his job was eliminated in the 1997 RIF, and no evidence exists that Reach was not qualified to do his job. Accordingly, the Court finds that Reach has established these two elements of his prima facie case.

For the final element of his prima facie case, Reach must show that his disability was a determining factor in the decision to terminate his employment in the 1997 RIF. *See Aucutt*, 85 F.3d at 1318. Here is where Reach's claim fails. Reach has done little to show that his disability played any sort of role in his selection for the 1997 RIF. He merely claims that his superiors, Daniel and Neeter, were aware of his alleged disability. The Eighth Circuit has held that the mere knowledge of a disability is insufficient to establish a prima facie case absent evidence that creates an inference of discrimination. *See Price v. S–B Power Tool*, 75 F.3d 362, 365 (8th Cir.1996). Looking at the involvement of Daniel and Neeter, Reach has not established any inference of discrimination or link between his disability and the 1997 RIF.

Daniel's involvement in the 1997 RIF was limited. Neeter approached Daniel regarding where reductions could be made in his area. Daniel did not want to make any reductions. When pressed, however, Daniel reluctantly identified Reach's position as the position that could be eliminated with the least business impact. Daniel had no other involvement in the RIF decision. The only connection between Reach's disability and the 1997 RIF was that Daniel was aware of Reach's medical problems and he identified Reach's position as a potential for the 1997 RIF.

---

**2.** Because the Court has determined that Reach is disabled under the ADA, the Court will not address whether AlliedSignal regarded Reach as disabled.

Daniel's response to Reach's medical problems and resulting attitude toward Reach due to those problems could hardly be described as creating an inference of discrimination. Daniel first met Reach in November of 1994 when he visited him in the hospital. It is undisputed that Daniel worked with Reach in his efforts to return to work and granted him greater flexibility than AlliedSignal's policy regarding such matters. Reach admits that he and Daniel had a close relationship and regarded each other as friends. Furthermore, Daniel invited Reach to accompany him into his new managerial unit in January 1997 when Reach was in need of finding a new position. Its unlikely that Daniel would have requested that his friend accompany him to a new position in January of 1997 and then hoped to have Reach's employment terminated by identifying his position as a potential for the November 1997 RIF. *See Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir.1996) (holding that when the same decision maker is involved in the hiring and firing decisions in a short period of time, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer"). In fact, Daniel expressed the difficulty he had in identifying Reach's position as a possibility of elimination because of their friendship. Reach admits that Daniel never did anything or said anything to suggest that he wanted to target Reach for RIF because of Reach's medical problems or leaves of absence. No inference exists that Daniel identified Reach's position for the RIF because of his disability.

With regard to Neeter, he made the ultimate decision to recommend that Reach's position be terminated in the RIF. There is little evidence that Neeter was even aware of Reach's medical condition, and no evidence that Neeter was motivated to eliminate Reach's employment because of his medical condition. Neeter had only been employed by AlliedSignal a little more than a year prior to the RIF. As Reach has stated, "Phil Neeter ... was very new to his job....[W]hen those [RIF] decisions were made Phil Neeter wouldn't know me from hardly anyone else in facilities." [MCHR trans. p. 21] Neeter testified that he had no knowledge of Reach's medical condition, use of FMLA leave, or other FMLA issues at the time he made the decision to eliminate Reach's position.

Reach's only evidence indicating that Neeter was aware of his condition involves a dispute over seven hours of FMLA leave. Apparently, Reach was denied seven hours of leave due to a limitation existing in his FMLA qualifications. Reach obtained documentation from his doctor that dismissed the limitation and AlliedSignal granted him those additional seven hours of FMLA leave. After a meeting was held to discuss the requested FMLA leave, Reach vaguely recalls that either Daniel or another supervisor was going to inform Neeter regarding the outcome of the dispute. There is no evidence regarding what information, if any, was relayed to Neeter. Reach cannot rely merely on a vague recollection to show that his disability was a determining factor in the adverse 1997 RIF decision. *See McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995) (holding that cursory and conclusory allegations are insufficient to create an inference of discrimination). Neeter testified that he had no knowledge of Reach's medical condition or his FMLA leave. Reach has failed to come forth with any evidence sufficient to show that Neeter was aware of Reach's disability or FMLA leave. Furthermore, even if Neeter were aware of Reach's disability and FMLA leave, there is no evidence creating an inference that Reach's disability was a determining factor in Neeter's decision to

recommend that Reach's position be eliminated in the 1997 RIF decision.

Finally, Reach argues that an inference of discrimination can be drawn from the fact that three of his nine projects still needed more work. Reach disputes AlliedSignal's position that these projects were essentially completed. Even if work on these projects still remained, there is no evidence that AlliedSignal aborted work on these projects in order to terminate Reach's employment in the 1997 RIF due to his disability.

Reach has failed to introduce any evidence that would show his disability was a determining factor in the decision to eliminate his employment in the 1997 RIF. As such, Reach cannot establish a prima facie case of disability discrimination. Accordingly, AlliedSignal's motion for summary judgment on Reach's claims of disability discrimination under the ADA and MHRA is GRANTED.

## B. FMLA Retaliation (Count II)

■ Reach also claims that he was selected for the 1997 RIF in retaliation for his FMLA leave and opposing FMLA discriminatory practices. The FMLA prohibits an employer from using FMLA leave as a factor in adverse employment decisions. *See* 29 U.S.C. § 2615; 29 C.F.R. § 825.220. Similar to the ADA, the FMLA is analyzed using *McDonnell Douglas's* burden-shifting framework. *See Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 161 (1st Cir.1998). In order to establish a prima facie case of FMLA retaliation, Reach must show that "(1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; and (3) there is a causal connection between [his] protected activity and [AlliedSignal's] adverse employment decision." *Id.*

■ The parties do not dispute that Reach can establish the first two elements of a prima facie case. Instead, the parties debate whether Reach can establish a prima facie case with regard to a causal connection between his FMLA leave and his selection for RIF. "The requisite causal connection may be proved circumstantially by showing the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive." *Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 715–16 (8th Cir.2000). "Generally, however, more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue of retaliation exists." *Id.* at 716.

■ In order to show a causal connection, Reach must first establish that a person with decision-making authority knew about his FMLA leave. Reach claims that Susan Anderson, Dr. Dixon and Dr. Bennet, medical and benefits personnel, targeted him for RIF. These people had no decision-making authority in the RIF and they did not discuss the FMLA leave with Neeter. *See McLaughlin,* 50 F.3d at 512 (holding that statements by employees without decision-making authority do not give rise to a reasonable inference of discrimination).

Reach simply debates whether Neeter knew about the FMLA leave. He also claims that Daniel knew about the FMLA leave and played a part in the decision. As discussed previously, Reach's vague recollection of overhearing a conversation where one of two people might have said they were going to report the status of Reach's FMLA leave to Neeter is not evidence. Reach needs something more than his self-serving, vague recollection. Neeter has testified that he did not know about Reach's medical condition or his FMLA leave. Even if Neeter did know about the FMLA leave, mere knowledge of the situation fails to create an inference of discrimination. *See Price v. S–B Power Tool,* 75

F.3d 362, 365 (8th Cir.1996) (holding that mere knowledge of disability is insufficient to create an inference of discrimination).

Although Daniel knew about Reach's medical condition and his subsequent FMLA leave, there is no causal connection between the FMLA leave and Daniel's involvement in the RIF. Daniel's actions toward Reach evidence no discriminatory animus. Daniel went far beyond his role as a supervisor to accommodate Reach's health problems and help Reach return to work. Daniel even submitted a letter to help Reach resolve the dispute over the seven hours of FMLA leave in Reach's favor. Furthermore, Daniel did not make the final decision. He was only asked to make a recommendation of which position could be eliminated with the least business disruption. No causal connection exists based on the knowledge of Neeter and Daniel.

Reach also claims that the posting of two positions after the 1997 RIF evidences a causal connection between Reach's FMLA activity and the decision to eliminate his position in the RIF. Reach's argument is essentially that AlliedSignal should have known what positions would become available months after the RIF and have considered whether Reach's qualification would allow him to fit into one of those positions. Such an expectation is unreasonable. Furthermore, the positions that were available were jobs that Reach never held and required degrees that he did not have. In addition, one position opening was canceled and the job never filled, and the other was filled internally nearly a year after the RIF. There is no causal connection between the RIF and Reach's FMLA activity evidence by these two job posting.

■ Even if the Court were to agree that there was a causal connection between the RIF and Reach's FMLA leave, Reach has failed to show any evidence of pretext. AlliedSignal has a legitimate, nondiscrimi-natory reason for terminating Reach's employment—a reduction in force that eliminated not only Reach's employment, but the employment of 42 other employees. Reach has come forward with no evidence of pretext or reason to distrust AlliedSignal's reason for terminating Reach's position. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105(2000) (holding that a plaintiff's prima facie case coupled with sufficient evidence for a reasonable fact finder to reject the employer's reason for termination is permissible for liability). As a result, the Court GRANTS AlliedSignal's Motion for Summary Judgment on Reach's claim of FMLA retaliation.

## IV. CONCLUSION

Based on the foregoing analysis, the Court hereby GRANTS AlliedSignal's Motion for Summary Judgment on Reach's claims of disability discrimination pursuant to the ADA and MHRA, and Reach's claim of retaliation for exercising his rights under the FMLA. Having reached a final judgment, the Court directs the Clerk of Court to terminate the action.

IT IS SO ORDERED.